In re HESSINGER & ASSOCIATES, Appellant.

In re Mark E. ELECCION, Appellant.

In re Deborah Anne SOGGE, Appellant.

Nos. C–94–3969–VRW, C–94–3736–VRW and C–94–3981–VRW.

United States District Court, N.D. California.

Jan. 22, 1996.

Joseph Hessinger and Joseph Johnson, Hessinger & Associates, San Jose, CA, for Hessinger & Associates.

Patricia A. Cutler and Stephen L. Johnson, U.S. Department of Justice, Office of the United States Trustee, San Francisco, CA, for Linda Ekstrom Stanley, United States Trustee.

## ORDER.

WALKER, District Judge.

On December 29, 1993, appellant law firm Hessinger & Associates ("appellant," "the firm," or "Hessinger") filed a Chapter 7 bankruptcy petition on behalf of Deborah Anne Sogge ("the *Sogge* case"). On January 14, 1994, appellant filed a Chapter 7 petition on behalf of Mark E. Eleccion ("the *Eleccion* case"). Both of these cases came before Bankruptcy Judge Alan Jaroslovsky. The cases proceeded more or less normally until March 10, 1994, when appellee United States Trustee filed a petition with Judge Jaroslovsky seeking review of appellant's fees in these cases. A hearing on the appropriateness of appellant's fees was held on April 15, 1994, and Judge Jaroslovsky was so troubled by what he perceived as overpriced, incompetent and unethical legal practices by appellant that three days later he sua sponte ordered the opening of a miscellaneous case designed to investigate and potentially discipline appellant ("the *Miscellaneous* case").

The day after the *Miscellaneous* case was opened, Judge Jaroslovsky entered an order in that case which held dischargeable the retainer agreements entered into by appellant and its clients under which those clients were required to make post-petition payments ("the dischargeability order"). Appellant immediately appealed this order to the Bankruptcy Appellate Panel for the Ninth Circuit, which declined to hear the appeal for want of jurisdiction. The propriety of the dischargeability order is one of the questions currently before the court.

On May 24, 1994, Judge Jaroslovsky entered an order to show cause in the *Miscellaneous* case which required appellant to make a showing why it should not be sanctioned for violations of the California Rules of Professional Conduct ("the Rules"). Appellant, meanwhile, filed fee applications in *Sogge* and *Eleccion.*

On July 11, 1994, Judge Jaroslovsky held a hearing on the order to show cause in the *Miscellaneous* case. On July 21, 1994, Judge Jaroslovsky issued a memorandum in which he deferred decision in the *Miscellaneous* case until August 1, 1994, at which time a consolidated hearing would be held concerning both the *Sogge* and *Eleccion* fee applications and the order to show cause. On August 9, 1994, after this hearing was held, Judge Jaroslovsky issued a colorfully worded memorandum of decision in the *Miscellaneous* case which sanctioned appellant $100,000 for various violations of the Rules. See *In re*

*Hessinger & Associates,* 171 B.R. 366 (Bkrtcy.N.D.Cal.1994). On August 16, 1994, Judge Jaroslovsky issued an order disallowing appellant's fees in *Sogge* and *Eleccion.*

Although all three cases are now nominally before the court for review, appellant's main challenge is to the order issued in the *Miscellaneous* case. In that order, Judge Jaroslovsky found that appellant had committed several different violations of the Rules, including: (1) allowing non-lawyers to control the firm; (2) improperly splitting legal fees between lawyers and nonlawyers; (3) incompetently rendering legal services; (4) aiding nonlawyers engage in unauthorized practice of law; and (5) collecting unconscionably high fees. As a punishment for these violations, Judge Jaroslovsky fined appellant $100,000 and forbade appellant from practicing bankruptcy law in this district until the fine was paid. Judge Jaroslovsky expressly noted, however, that other judges in the district could amend the order to allow appellant to practice in front of them if they so desired. Hessinger has challenged this order on several grounds, claiming both that the bankruptcy court lacked the power to issue it and that the bankruptcy court erred in its deposition of the legal issues raised in the *Miscellaneous* case.

As noted above, now before the court is Hessinger's appeal of the bankruptcy court's orders in *Sogge, Eleccion* and the *Miscellaneous* case. For the reasons discussed below, the court AFFIRMS the orders in *Sogge* and *Eleccion,* AFFIRMS IN PART and REVERSES IN PART the order in the *Miscellaneous* case and REMANDS the *Miscellaneous* case to the bankruptcy court for further proceedings consistent with this order.

I

■ Appellant first claims that the bankruptcy court lacked the authority to issue sanctions against the firm. Appellant bases this argument on the Ninth Circuit rule, first enunciated in *In re Sequoia Auto Brokers, Ltd., Inc.,* 827 F.2d 1281, 1284 (9th Cir.1987), which states that bankruptcy courts have neither inherent nor statutory authority to issue contempt orders. *Sequoia,* 827 F.2d at 1288. Appellant apparently believes that the sanctions imposed against it were a contempt order, and thus that *Sequoia* applies with full force to the instant case. This is incorrect.

Appellant has failed to point to any instance in the record where the bankruptcy court found the firm in contempt or characterized the sanction award as being made pursuant to an inherent contempt power. Indeed, appellant does not deny that the bankruptcy court awarded the sanctions because it found that the firm had violated the California Rules of Professional Conduct, not because it found that the firm had violated one of the court's own orders. Given this, it is difficult to see how appellant can claim that the sanctions were entered under the contempt power. The propriety of the sanction order is thus not controlled by the *result* reached in *Sequoia,* since that case dealt only with the bankruptcy courts' contempt powers. The analytical framework established by the *Sequoia* court does control the court's analysis in this situation, however, and thus the court must employ this framework to answer the question whether the bankruptcy courts have the authority to issue sanctions designed to enforce the Rules.

In order to answer this question, it is important first to understand exactly how the bankruptcy court shaped its sanction. The sanction was based on former Civil LR 110–7, which empowered the courts in this district to "take any appropriate disciplinary action" against an attorney who had engaged in "conduct which may warrant discipline." The sanction itself was a $100,00 fine to be paid to the clerk of the court. Crucially, however, the bankruptcy court did not threaten the firm with a contempt citation for failing to pay this fine; rather, the court merely held that "[u]ntil the fine is paid in full, Hessinger and his firm will not be permitted to practice bankruptcy law in this district, nor charge any person any fee whatsoever for any bankruptcy-related service in this district. Provided, however, that any other judge in this district may modify this order as to cases pending before him or her as he or she sees fit." In a footnote, the bankruptcy court stressed that it was not "so presumptuous as to issue an order telling any

of the other judges of this district who may appear before them," and that accordingly the sanction could be waived by any other judge who saw fit to do so.

It is apparent, then, that the sanction was nothing more than a conditional disqualification of the firm from practicing before Judge Jaroslovsky. If the firm chose not to pay the fine, it at no time was threatened with imprisonment, as would be the case in a contempt proceeding; rather, this failure would merely result in the forfeiture of the privilege of practicing before Judge Jaroslovsky. As will be seen, this narrow sanction implicates none of the concerns which led the *Sequoia* court to find that convincing evidence of Congressional intent to confer the contempt power was necessary for bankruptcy courts to exercise it.

■ The contempt power considered in *Sequoia* is uniquely judicial; it gives courts the "ability to penalize disobedience to judicial orders," and thus is "essential in ensuring that the Judiciary has a means to vindicate its own authority without complete dependance on other branches." *Sequoia*, 827 F.2d at 1284. Article III is the source of the federal courts' inherent power to punish for contempt. Id. Because the bankruptcy courts are creatures of Article I, not Article III, they have no need to invoke an inherent contempt authority in order to enforce compliance with their orders; they may rely on Article III courts to perform this function. Id. Moreover, because the bankruptcy courts are creatures of Article I, they have no "inherent" powers and their jurisdiction is limited to that expressly granted by Congress. See generally *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

Because "the power to imprison or fine summarily is an awesome power," *Sequoia*, 827 F.2d at 1284, the *Sequoia* court refused to find that Congress had conferred it on the bankruptcy courts in the absence of clear Congressional intent to do so. In large part this hesitance on the part of the *Sequoia* court grew out of the constitutional difficulties—highlighted by the Supreme Court in the *Marathon* case, cited above—inherent in

finding that Congress had attempted to confer the vast and singularly judicial contempt power on the Article I bankruptcy courts.

In *Marathon*, the Supreme Court held that the 1978 Bankruptcy Act, which had given the bankruptcy courts authority to adjudicate state-created rights and to cite for contempt, had "impermissibly removed most, if not all, of the essential attributes of the judicial power from the Article III district court, and ha[d] vested those attributes in an non-Article III adjunct." *Marathon*, 458 U.S. at 87, 102 S.Ct. at 2880. The *Marathon* court also held that "[s]uch a grant of jurisdiction cannot be sustained as an exercise of Congress' power to create adjuncts to Article III courts," id., and indeed that it threatened the independence of the judiciary and the separation of powers. The *Marathon* court thus declared the Act unconstitutional, an act which forced Congress to reformulate the jurisdictional bases of the bankruptcy courts. *Sequoia*, 827 F.2d at 1286–87.

In response to *Marathon*'s striking down of the 1978 Act, Congress amended the Act in 1984. These amendments repealed sections of the 1978 Act which had defined the bankruptcy court as a "court of the United States" and which had given bankruptcy courts the powers of courts of equity, law and admiralty. See 1984 Amendments, 98 Stat. 333, 346. By abrogating these broad grants of jurisdiction, Congress withdrew, among other powers, the contempt power which it had granted in the 1978 Act. *Sequoia*, 827 F.2d at 1288.

It was this express withdrawal of the contempt power which led the *Sequoia* court to hold that the bankruptcy courts do not possess any inherent contempt power. *Id.* at 1288–89. The Constitutional concerns discussed above also led the *Sequoia* court to conclude that neither 11 U.S.C. § 105 (authorizing the bankruptcy court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]") nor 28 U.S.C. § 157 (giving the bankruptcy courts jurisdiction over core proceedings) could be read as a legislative grant of contempt power sufficiently precise to overcome the presumption raised by the

post-*Marathon* amendment of the 1978 Act. *Id.* at 1289–90.

The *Sequoia* court's hesitancy to find a grant of the contempt power to bankruptcy courts was thus driven in no small measure by the constitutional difficulties which lurk in such a grant after *Marathon;* in light of these difficulties, the *Sequoia* court was understandably hesitant to infer a legislative grant of such power from general jurisdiction provisions. Because the bankruptcy court's authority to sanction attorneys for violation of the California Code of Professional Responsibility is much less troublesome than that court's exercise of the Article III-based contempt power, however, *Sequoia*'s extremely cautious approach toward the power of bankruptcy courts is not warranted in the instant case.

The sanction power, at least as used by the bankruptcy court in this case, differs substantially from the contempt power considered in *Sequoia.* The most fundamental difference lies in the fact that the sanction power is used to punish violations of rules promulgated by the California legislature, not orders of the court itself; there thus is much less of a risk that the sanction power will be used arbitrarily by a bankruptcy court. Moreover, the sanction imposed below did not include the threat of imprisonment for disobedience; rather, the only punishment mentioned for failing to pay the fine was the forfeiture of the privilege of practicing in front of Judge Jaroslovsky. Such a sanction is a far cry from the "awesome" contempt power identified by the *Sequoia* court and seems fully within the authority conferred upon the bankruptcy court by 11 U.S.C. § 105(a), which gives that court the authority to issue "any order * * * that is necessary or appropriate to carry out the provisions [of the Bankruptcy Code]." The Rules, after all, are designed both to protect the public from being preyed upon by lawyers who have completely abandoned their duty to the public and to protect the bar and the court system from being tarnished by having such lawyers in their midst. It is therefore imperative that the Rules be enforced at all times, including in bankruptcy court; indeed, the goals of the Bankruptcy Code would be distorted and subverted if unethical lawyers were allowed to use the bankruptcy system for their own personal gain.

In sum, given the limited effect of the bankruptcy court's sanction, and given the need for the bankruptcy court to be able to ensure that attorneys who practice in front of it meet at least the minimal requirements of professional ethics, the court concludes that § 105(a) supplied the bankruptcy court with sufficient authority to assess the sanctions in question in this case.

## II

Appellant has also asked the court to rule on the issue whether the fee arrangements between the firm and its clients are properly considered to be pre-petition debts which are subject to discharge under § 727 of the Code. In an interlocutory order, the bankruptcy court ruled that the fee agreements were dischargeable; appellant appealed this decision to the Bankruptcy Appellate Panel, which ruled that it lacked jurisdiction over the appeal and thus refused to reach the merits of the dischargeability question.[1] After entering this interlocutory order, the bankruptcy court determined that, due to the firm's poor representation of Ms. Sogge and Mr. Eleccion and due to the firm's violations of the Rules, the firm was *not* entitled to fees in the *Sogge* and *Eleccion* cases in any event.

Appellant has failed to appeal the bankruptcy court's conclusion that the firm is not entitled to fees in the *Sogge* and *Eleccion* cases even if the fee agreements are not dischargeable; appellee appears to argue that the dischargeability issue is therefore moot, or at least not properly before the court at this time. A close reading of the bankruptcy court's interlocutory order, however, reveals that it has an effect beyond simply determining whether appellant is entitled to fees in *Sogge* and *Eleccion.* Specifically, the order: (1) forbade appellant from

1. Appellant also appears to ask the court to review the BAP's ruling that it lacked jurisdiction to hear the interlocutory appeal. The court, however, *itself* lacks jurisdiction to review final rulings of the BAP; such appeals may be made only to the Ninth Circuit. 28 U.S.C. § 158(d).

attempting to enforce any prepetition contracts after the filing of a bankruptcy petition; (2) forbade appellant from cashing any prepetition checks it had received from its clients after the filing of a bankruptcy petition; (3) forbade appellant from entering into any reaffirmation agreements with its clients without prior court approval; (4) ordered appellant to print "THIS CONTRACT IS NOT ENFORCEABLE AFTER BANKRUPTCY" in bold typeface on all of its fee contracts; and (5) forbade appellant from charging its clients for any postpetition services without first obtaining leave from the court. M record at 8, 9. This order obviously is intended to have a present effect on how appellant is conducting its business, and the court's vacation of this order would accordingly provide appellant with effective relief. The dischargeability issue thus constitutes a "case or controversy" sufficient to confer jurisdiction on this court. See generally *United States v. Johnson*, 319 U.S. 302, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943) (case dismissed because it did not present a genuine case or controversy). The court will accordingly consider the propriety of the bankruptcy court's ruling that the firm's fee contracts are dischargeable pre-petition debts.

■ Debt discharge is the raison d'etre of filing for bankruptcy. When a bankruptcy petition is filed, all of the debtor's creditors are automatically stayed from seeking collection of their debt; this stay remains in effect until the end of the bankruptcy case. 11 U.S.C. § 362. As the case commences, a bankruptcy estate is formed out of the debtor's pre-petition assets and a reorganization plan is developed in which the debtor's prepetition creditors are paid out of the estate. See generally 11 U.S.C. § 501 et seq. Once the case is concluded, the debtor is discharged of all of his pre-petition debt; his pre-petition creditors receive nothing beyond what they were awarded in the reorganization plan. See, *for example*, 11 U.S.C. § 727. Giving the debtor this "fresh start" is the purpose of the Bankruptcy Code.

Because discharge lies at the very heart of the Code, it is not surprising that the Code provides for only very limited exceptions to the general rule that all pre-petition debts are discharged when the bankruptcy case is closed. These exceptions are contained in 11 U.S.C. § 523, which lists some eleven types of debts which are not affected by the discharge. Pre-petition retainer contracts of the type utilized by appellant are not one of the debts explicitly rendered non-dischargeable by this section, nor does appellant argue that such contracts can be fit inside any of the existing exceptions found in § 523. Rather, appellant argues that policy considerations, taken in conjunction with another part of the code which provides for bankruptcy court oversight of attorney fees, compel the conclusion that pre-petition retainer contracts are *impliedly* excepted from discharge by the Code.

The statutory basis for appellant's argument that the Code impliedly excepts retainer agreements from discharge is 11 U.S.C. § 329, which requires an attorney representing a debtor to "file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered * * *" Appellant points to the language "agreed to be paid" as evidence that future—and therefore post-petition—payment of pre-petition retainer fees is clearly contemplated by the Code. Appellant then notes that the Code makes no effort to reconcile the regulation of fee arrangements provided for in § 329 with the discharge provisions found in §§ 727 and 523 and argues that § 329, since it deals specifically with attorney fees, should control the more general discharge provisions found in §§ 727 and 523.

The problem with appellant's argument is that it hinges on the conclusion that § 329 is in intolerable tension with §§ 727 and 523. This simply is not so; § 329 does not purport to address dischargeability, but rather deals only with court oversight of attorney fees. There is a tension between oversight of fees and dischargeability of pre-petition fee agreements only if one concludes that dischargeability and oversight are intended to serve the same purpose, which is a far from inevitable conclusion. Court oversight of fees as provided in § 329 protects from over-

reaching by bankruptcy counsel in *all* manner of fee arrangements, including arrangements in which complete payment is made up front. Dischargeability, on the other hand, applies to *all* debts, not simply pre-petition fee agreements. Thus, even if § 727 is read to discharge pre-petition fee agreements, § 329 is not rendered a nullity.

■ In addition to its statutory interpretation argument, appellant makes the policy argument that holding that pre-petition fee agreements are dischargeable will destroy such agreements as a viable means of financing a bankruptcy, which in turn will effectively close the doors of the bankruptcy court to all those who do not have enough money to pay their lawyers up front. This argument makes a good deal of sense; it is also beside the point. When a statutory scheme is "coherent and consistent," the plain language of a statute is conclusive as to its meaning. *United States v. Ron Pair Enterprises,* 489 U.S. 235, 240–41, 109 S.Ct. 1026, 1029–30, 103 L.Ed.2d 290 (1989). In such a case, any judicial inquiry into the purpose, background or legislative history of the statute is foreclosed unless a literal application of the statute produces results contrary to a clearly expressed legislative intent. *Id.* at 242, 109 S.Ct. at 1030.

The Bankruptcy Code is nothing if not "coherent and consistent." Because § 523 of the Code defines so precisely the handful of debts which are not subject to discharge, the court declines to hold that further exceptions to discharge should be implied due to policy concerns. The proper forum for appellant's argument is Congress, not the court. Because the pre-petition retainer agreements used by appellant are subject to discharge under § 727 of the code, the bankruptcy court's April 18, 1994, order is AFFIRMED.

### III

■ Appellant also alleges that the April 18, 1994, order is invalid because it was made after the bankruptcy court lost jurisdiction over the case due to appellant's interlocutory appeal of the discharge order to the BAP. This contention is without merit. The general rule in civil litigation is that a lower court loses jurisdiction over the subject matter of the appeal once a notice of appeal is filed, see, for example, *In re Combined Metals Reduction Company,* 557 F.2d 179, 200 (9th Cir.1977). Bankruptcy cases, however, often present a number of unrelated issues and thus often avoid the effect of this general rule. Such was the case in this action. Appellant's interlocutory appeal concerned only the issue whether the fee arrangements were dischargeable debts; it had nothing to do with any other issues in the case. It follows that the bankruptcy court was divested only of jurisdiction to resolve the dischargeability issue; its power to resolve other issues in the case was completely unaffected by the appeal of the dischargeability issue. See *In re Wade,* 115 B.R. 222 (9th Cir. BAP 1990), *aff'd* 948 F.2d 1122 (9th Cir.1991) (bankruptcy court's jurisdiction to consider counterclaim against Bar Association for willful violation of automatic stay was not affected by interlocutory appeal of court's grant of Bar's request for relief from stay in order to pursue disciplinary proceedings, since different issues were involved in the two actions). Because appellant has not suggested that there is any connection between the issues on the interlocutory appeal and the issues later decided by the bankruptcy court, that appeal did not divest the bankruptcy court of jurisdiction to make those rulings. Appellant's claim to the contrary is without merit.

### IV

Appellant has also made a vague and rambling argument that it was denied due process in the bankruptcy court. Tellingly, appellant does not advance a coherent theory of exactly which aspect of the bankruptcy court proceeding denied it due process, nor does it cite even one case in support of its due process argument. Rather, appellant simply recites a string of perceived procedural inadequacies. Appellant's arguments in this area do not withstand scrutiny.

Central to appellant's due process argument is the proposition that appellant was not allowed to testify or present evidence in the *Miscellaneous* case and that the evidence relied upon by the bankruptcy court in that case was in fact received only in *Sogge* and *Eleccion.* A fair reading of the record shows

that this is simply not true. The *Miscellaneous* case was opened on April 18, 1994, and the Discipline OSC was issued on the next day. An abbreviated hearing on the Discipline OSC was held on July 11, 1994, at which the bankruptcy court questioned Mr. Hessinger about his business practices. No witnesses testified at this hearing, at the end of which the bankruptcy court continued the matter to August 1, 1994, to be heard at the same time as the continued hearings in *Sogge* and *Eleccion.* At the August 1 hearing, all of the evidence eventually relied upon by the bankruptcy court in its order in the *Miscellaneous* case was entered into evidence, either in the form of declarations or live testimony.[2] Appellant was represented by two attorneys at this hearing, who ultimately decided not to object[3] to any of the evidence being entered against appellant and who had the opportunity to fully cross-examine the live witnesses.

In spite of the above facts, appellant claims that none of the evidence relied upon by the bankruptcy court in its *Miscellaneous* order were entered into evidence in the proceedings against the firm. Appellant's argument appears to be that the August 1, 1994, hearing concerned only *Sogge* and *Eleccion,* not the *Miscellaneous* case. This again is simply not true. The record clearly indicates that the August 1, 1994, hearing was called as a *consolidated* hearing of the *Miscellaneous, Sogge,* and *Eleccion* cases. The record also indicates that at that hearing both appellee and the bankruptcy court made clear their intent to rely on the same set of declarations in all three cases. There is simply no reason for the court now arbitrarily to split off the *Miscellaneous* case from *Sogge* and *Eleccion* and say that the evidence entered at the August 1, 1994, hearing was entered only in the latter two cases. Without such an arbitrary splitting of the evidence, appellant's

due process argument is baseless and perilously close to being frivolous. The court therefore finds that the bankruptcy court proceedings did not in any way violate the Due Process Clause.

**V**

**A**

■ Finally, appellant argues that no factual basis exists for the bankruptcy court's determination that the firm violated the California Rules of Professional Conduct. In order to address this argument, the court must first determine whether the *Miscellaneous* case was a core or non-core proceeding. If the *Miscellaneous* case was a core proceeding, the bankruptcy court was empowered to enter a final judgment and the standard of review to be applied in the current appeal would be identical to the standard used in other civil matters appealed from a district court to a circuit court of appeal: clearly erroneous review of factual findings and de novo review of legal conclusions. See FRBankrP 8013; *In re Diversified Contract Services, Inc.,* 158 B.R. 169, 171 (N.D.Cal.1993). If the *Miscellaneous* case was a non-core proceeding, on the other hand, the court must conduct a de novo review of both the bankruptcy court's findings of fact and its conclusions of law. *In re Jogert, Inc.,* 950 F.2d 1498, 1501 (9th Cir. 1991).

The parties seem to assume, erroneously, that the *Miscellaneous* case was a core proceeding. Core proceedings are defined in 28 U.S.C. § 157(b), which has a number of subsections that, taken together, provide a nonexhaustive list of proceedings which qualify as core. The only subsection which could possibly apply to the *Miscellaneous* case in

---

2. The evidence relied upon by the bankruptcy court in its order in the *Miscellaneous* case was entered in that case in the following manner: the Downey and Morehouse declarations were originally filed in the *Miscellaneous* case in July 1994; the Kung and Sutin declarations were originally filed in *Sogge* and *Eleccion* and were moved into evidence in the *Miscellaneous* case at the August 1, 1994, hearing; and Ms. Morris' testimony was given at the August 1, 1994, hearing.

3. Appellant's attorneys did initially object to the fact that they did not receive the declarations until two days prior to the hearing date; appellant now claims that the bankruptcy court overruled this objection. The record indicates, however, that while the bankruptcy court did express its doubt that the objections were warranted, it also clearly gave appellant's attorneys an opportunity to press their objections, which they declined to do. Appellant cannot now characterize this tactical decision by its own attorneys as a denial of due process.

§ 157(2)(O), which defines as core "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims." This subsection could perhaps be read to make a disciplinary proceeding core if that proceeding was pursued in the course of processing a bankruptcy petition, since finding that a law firm violated the Rules could lead to that firm forfeiting its fees (as happened in *Sogge* and *Eleccion*), and such a forfeiture would "affect the liquidation of the assets of the estate."

In the instant case, however, to apply § 157(2)(O) to make the *Miscellaneous* case a core proceeding would bend the language of that subsection past its breaking point. The *Miscellaneous* case was concerned solely with issue of the firm's professional misconduct and addressed neither the assets of any bankruptcy estate nor the adjustment of debtor-creditor relations or the equity security holder relationship. Given this fact, the court cannot conclude that the *Miscellaneous* case properly can be defined as core under § 157(2)(O) or under any other subsection to § 157. It follows that the *Miscellaneous* case was a non-core proceeding, and that the court must conduct a de novo review of both the bankruptcy court's findings of facts and its conclusions of law.

### B

The bankruptcy court found that the firm had committed several violations of the Rules. These violations can be summarized as follows:

(1) The firm violated Rule 1–600 by allowing non-lawyers to interfere with the independence and judgment of the firm's lawyers;

(2) The firm violated Rules 1–320 and 1–600 by splitting legal fees between lawyers and non-lawyers;

(3) The firm acted recklessly and incompetently, and therefore violated Rule 3–110(A), by placing its desire to maximize profits over its duty to assist its clients and by allowing nonlawyers to prepare bankruptcy petitions;

(4) The firm aided nonlawyers in conducting the unauthorized practice of law by employing nonlawyer "credit specialists" who as a practical matter were in charge of the individual petitions; and

(5) The firm violated Rule 4–200(A) by unconscionably charging a four-figure fee in practically every case.

#### 1. Lay control of the firm

The firm has not challenged the bankruptcy court's findings relating to this violation, nor has the firm challenged the bankruptcy court's conclusion that the alleged control of the firm by nonlawyers was indeed a violation of Rule 1–600. In the absence of such a challenge, the court declines to upset the bankruptcy court's conclusion that the firm violated Rule 1–600 by allowing Messrs. Cook and Kahraman, who are not lawyers, to control its operation.

#### 2. Improper fee splitting

The firm has challenged the bankruptcy court's conclusion that the firm violated Rules 1–320 and 1–600 by paying Mr. Cook a salary of $4000 per month, by funneling all its advertising business to an advertising company owned by Mr. Cook and by assigning to collection firms in which Mr. Cook had a financial interest promissory notes signed by Hessinger customers. The firm does not challenge the bankruptcy court's factual conclusion that these payments indeed took place; rather the firm argues that assigning the promissory notes to Mr. Cook's collection firms does not constitute a violation of Rules 1–600 and 1–320. Rule 1–600 provides "[a] member shall not participate in a nongovernmental program, activity, or organization furnishing * * * legal services, which allows any third person * * * to interfere with the member's independence of professional judgment, or with the lawyer-client relationship, or allows unlicensed persons to practice law, or allows any third person or organization to receive directly or indirectly any part of the consideration paid to the member except as permitted by these rules * * *." Rule 1–320 provides that "[n]either a member nor a law firm shall directly or indirectly share legal fees with a person who is not a lawyer,"

except in circumstances which are not present in this case.

█ The court does not agree with the bankruptcy court's conclusion that the firm's practice of directing its advertising and collection business to companies owned in full or in part by Mr. Cook by itself constitutes a violation of Rules 1–320 or 1–600. The bankruptcy court apparently felt that this direction of business constituted de facto payment of legal fees to Mr. Cook, and that such de facto payment constituted fee splitting in violation of Rules 1–320 and 1–600. This is an overly broad reading of these Rules. Law firms are businesses, after all, and like all businesses they often find themselves in need of the services of nonlawyers. Under the bankruptcy court's reading of Rules 1–320 and 1–600, all of these payments to nonlawyers could potentially be labelled unethical fee splitting. Although the court has been unable to find any authority on this issue, it does not believe that Rules 1–320 and 1–600 were intended to cast doubt on the ethical propriety of all payments made by law firms to nonlawyers in exchange for nonlegal services. The court therefore declines to adopt the bankruptcy court's reading of Rules 1–320 and 1–600.

Of course, the bankruptcy court perceived more than the simple purchase of nonlawyer services by the firm in this case; rather, the bankruptcy court saw the firm, the advertising company, and the collection agencies as all part of a single "get-rich-quick" scheme masterminded by Mr. Cook. Apparently, it was the law firm's position in this scheme which really led the bankruptcy court to find a violation of Rules 1–320 and 1–600. While the court shares the bankruptcy court's impression that the relationship between the firm and the rest of Mr. Cook's businesses is, to put it charitably, unseemly, it does not share the bankruptcy court's conviction that this unseemliness adds up to a violation of Rules 1–320 and 1–600. It appears from the record that the advertising and collection companies were indeed providing services in return for the firm's fees. The court declines to hold that this purchase of nonlawyer services constitutes unethical fee splitting.

█ The payment of a monthly salary to Mr. Cook is another matter. Although Mr. Hessinger was the nominal head of the firm, the record shows rather clearly that Mr. Cook was in fact the person in charge. As the bankruptcy court noted, exercise of this control by Mr. Cook over the firm's lawyers was itself a violation of Rule 1–600. In contrast to his advertising and collection companies, Mr. Cook himself was not providing any legitimate service to the firm which would justify a $4000 per month salary. Rather, the record shows that Mr. Cook was in fact the owner and operator of the firm, and thus that his monthly salary was in the nature of a monthly draw taken by a partner in a law firm. As such, this salary was properly characterized by the bankruptcy court as the splitting of legal fees, and that court properly concluded that payment of the salary violated Rules 1–320 and 1–600.

### 3. Failure to act competently

█ The bankruptcy court also found that the firm, by putting extreme pressure on its employees to sign up all persons who responded to the firm's advertisements as clients and by allowing nonlawyers to interview clients and to prepare their petitions, violated Rule 3–110(A), which prohibits attorneys from intentionally, recklessly or repeatedly failing to perform legal services competently. Appellant makes a number of vague factual objections to this finding. First, appellant argues that the bankruptcy court did not allow its lawyers to enter evidence which would show that the nonlawyer members of the firm's staff were adequately supervised and that the firm agreed to represent only 50% of the persons who expressed interest in the firm's services. This argument echoes appellant's due process argument which was rejected above, and it likewise fails. Appellant has not pointed to any instances in the record where it offered evidence which was refused by the bankruptcy court or where it requested an opportunity to present evidence and was rebuffed. The court likewise has failed to find any such instances in the record, and therefore finds meritless appellant's allegation that the factual record on the competence of its services

is insufficiently complete to support the bankruptcy court's findings.

Appellant next appears to challenge the factual basis of the bankruptcy court's incompetent representation finding by alleging that "[i]t is difficult, if not impossible for a person reviewing the court's file in any given bankruptcy case to determine the amount of work performed in the case." Appellant's brief at 37. Appellant also asserts that it employs paralegals to perform only what it refers to as "routine administrative tasks" and stresses that "all non-lawyers at Hessinger work under the direct supervision and control of a lawyer." Id. at 37. Appellant denies that paralegals make determinations or give advice which requires a decision by a lawyer.

The problem with appellant's assertions is that they are flatly contradicted by the record. Jennifer Kung, who worked for appellant both as a paralegal and later as an attorney, testified in a declaration that it was "routine practice" for paralegals in the firm to complete bankruptcy schedules and petitions for a firm attorney to sign later. See E record at 304. Ms. Kung also testified that one of her first tasks as a Hessinger attorney was an attempt to vacate the dismissal of four cases which had been dismissed because the petitions had been incorrectly completed by a paralegal. Id. Finally, Ms. Kung testified that Gary Hansen, a non-attorney manager, "often" interviewed clients; paralegals would then fill out the petitions of these clients and Bruce Kerr, a Hessinger attorney, would sign the petitions en masse. Id. Appellant has made no effort to contradict Ms. Kung's testimony other than to deny in its brief that the practices which she described in fact occurred.

Terrie Nickles, who also worked as a Hessinger paralegal, has similarly testified that she prepared bankruptcy schedules, filed bankruptcy petitions, and made decisions on which exemptions her clients should claim. S record at 177–78. Ms. Nickles also testified that she was not supervised by an attorney when performing the above duties and that her direct supervisor was not an attorney. Id. at 178. Similarly, Patricia Hoagland, another Hessinger paralegal, testified that she "performed functions without proper

legal supervision," that the firm was "organized similar to a production line, with little or no review by attorneys," and that "[p]aralegal/credit specialists were required to produce at least two bankruptcy petitions each day to keep their job." Id. at 193–94. Again, appellant has made no effort to specifically contradict this testimony.

The evidence in support of appellant's position that appropriate attorney supervision existed, consists mainly of declarations from Cynthia A. Dunning and Sunita N. Sood, two Hessinger attorneys. See S record at 234–38. Both Ms. Dunning and Ms. Sood testified that no paralegals under their supervision are allowed to give legal advice. Id. at 235, 238. Both also testified that they personally interviewed clients as part of their job duties; tellingly, however, neither denied that paralegals also performed this duty, nor did they deny that paralegals also filled out petitions and made decisions on exemptions. Id.

The record also includes a declaration from Joseph Hessinger which states that the firm's seven offices are staffed by a total of six attorneys. Id. at 249. Mr. Hessinger also testified that the firm makes "extensive use" of paralegals, legal assistants and secretaries and that "[i]nitial interviews, the filling out of forms, the completion of schedules and statement of affairs is performed by non legal staff under the supervision of an office attorney. All of our Pleadings are reviewed by competent counsel." Id.

In light of all of the above evidence, the court rejects the firm's claim that all legal issues which arise in the course of pursuing a bankruptcy are resolved by its attorneys. Given the large volume of cases which the firm apparently pursues and receives and given the fact that the firm has more offices than attorneys, the court concludes that a substantial amount of legal work is in fact performed by paralegals or non-lawyer "credit specialists" with little or no supervision from attorneys. The above-discussed testimony from former Hessinger employees provides ample support for this conclusion. The bankruptcy court's factual conclusion that paralegals perform a large part of the

legal work at the firm will therefore not be disturbed.

■ The court also declines to disturb the bankruptcy court's legal conclusions that the firm's reliance on non-lawyers to perform legal work violated Rule 3–110(A) and assisted the paralegals to engage in the unauthorized practice of law. The duty of competent representation includes the duty of adequately supervising non-attorney employees, see *Waysman v. State Bar,* 41 Cal.3d 452, 224 Cal.Rptr. 101, 714 P.2d 1239 (1986); by failing to provide such adequate representation, the firm violated Rule 3–110(A). This failure of supervision also created a situation in which paralegals were making final decisions on how important legal aspects of individual bankruptcy filings, such as the claiming of exemptions, should be handled; and this constituted the unauthorized practice of law by those paralegals.

As a final point on this issue, the court notes that a persistent theme in appellant's position on the role of paralegals in its practice is the argument that "everybody does it;" that is, all large consumer bankruptcy firms rely on paralegals to perform a large amount of the work required for filing a bankruptcy petition, and in all such firms the paralegals do so with only minimal attorney supervision. This may well be true; it may also be true that, given sufficient training, paralegals are fully capable of competently handling most aspects of a consumer bankruptcy case. The court, however, is not in a position to decline to enforce the Rules of Professional Conduct merely because application of those rules results in attorneys being required to perform work which could be performed less expensively and more efficiently by non-lawyers. Nor is the court in a position to condone an unethical practice merely because most consumer bankruptcy firms are engaging in it.

### 4. Unconscionable fees

■ Finally, appellant challenges the bankruptcy court's conclusion that it was charging its clients unconscionably high fees in violation of Rule 4–200(A). The bankruptcy court based this conclusion on the fact that the firm's average fee hovered around $1000, whereas other firms handling similar cases would often charge no more than $500 or $600. Appellant argues that its higher fees were justified by the fact that the firm was entering into retainer agreements in which the clients put no money down and did not begin payment until after the bankruptcy court entered a discharge.

Although not convinced that appellant's arguments explain the entire amount of the premium which appellant is charging its clients, the court does find appellant's explanation plausible as to at least some of that premium, and the court therefore declines to hold that the fees were so high as to be unconscionable under Rule 4–200(A). By allowing its clients to defer payment of their legal fees until after the termination of the case, appellant was both depriving itself of the value of that payment for the time between initiation and termination of the case and taking on the risk that it in some cases would not be reimbursed at all for legal work which it had performed. The court discerns nothing ethically disturbing in appellant charging its clients a premium as compensation for this loss of the time-value of the retainer fees and for the additional risk of nonpayment which appellant was shouldering. Because the record does not reflect the extent to which appellant's premium reflects these legitimate pricing concerns, as opposed to the extent to which it reflects simple overreaching by appellant, the court concludes that the record does not support a finding that appellant has violated Rule 4–200(A).

### 5. Summary

In sum, the court AFFIRMS the bankruptcy court's holdings that appellant violated Rules 1–320, 1–600 and 3–110(A) and that appellant aided its non-lawyer employees in the unauthorized practice of law. The court REVERSES the bankruptcy court's holding that appellant violated Rule 4–200(A). Because it is unclear whether the bankruptcy court would have entered the same sanction against appellant without the finding of a violation of Rule 4–200(A), the court VACATES that part of the bankruptcy court's order which provides for the sanction and REMANDS case C–94–3969 to the bankruptcy court for a determination whether the

sanction should be lessened in light of this opinion.

## VI

Case C-94-3736, *In re Deborah Anne Sogge,* is AFFIRMED.

Case C-94-3981, *In re Mark E. Eleccion,* is AFFIRMED.

Case C-94-3969, *In re Hessinger & Associates,* is AFFIRMED IN PART, REVERSED IN PART, and REMANDED to the bankruptcy court for further proceedings consistent with the foregoing.

IT IS SO ORDERED.

## JUDGMENT.

In accordance with this court's order of January 22, 1996, Case C-94-3981, *In re Deborah Anne Sogge,* is affirmed. Case C-94-3736, *In re Mark E. Eleccion,* is affirmed. Case C-94-3969, *In re Hessinger & Associates,* is affirmed in part, reversed in part, and remanded to the bankruptcy court for further proceedings.