In re CASTORENA, Michael, Castorena, Jamie, Debtors.

Turner, Brent, Turner, Shawna, Debtors.

Bird, Chris, Debtor.

Hansen, Lynda, Debtor.

Moore, Debbie, Debtor.

Bailey, Terry, Bailey, Amy, Debtors.

Holverson, Joshua, Debtor.

Wells, Donald, Debtor.

Wells, Daniel Debtor.

Baker, Christopher, Baker, Peggy, Debtors.

Cook, Carye, Debtor.

Christen, Charlene, Debtor.

Ellis, Christopher, Ellis, Bonnie, Debtors.

Oneil, Nicole, Debtor.

Wilkinson, Stephanie, Debtor.

Mitchell, Joseph, Debtor.

Nolan, Marilyn, Debtor.

Haney, Birdie, Debtor.

Allen, Tom, Debtor.

Nos. 01–40473, 01–40625, 01–40687, 01–40696, 01–40749, 01–40750, 01–40782, 01–40783, 01–40804, 01–40806, 01–40808, 01–40822 to 01–40824, 01–40855 to 01–40857, 01–40876, 01–40877.

United States Bankruptcy Court, D. Idaho.

Nov. 28, 2001.

## MEMORANDUM OF DECISION ON REVIEW OF ATTORNEY FEES

TERRY MYERS, Bankruptcy Judge.

## I. INTRODUCTION

### A. The genesis

In the 19 consumer chapter 7 cases shown in the above caption, attorney Tom Hale ("Counsel") provided legal services to the debtors. Even so, each of the debtors appeared *pro se* in prosecution of his, her or their case.

Counsel is not the only attorney operating in such a fashion. Chief Bankruptcy Judge Jim D. Pappas of this Court recently issued a Summary Order in several cases where attorney Bruce Palmer similarly attempted to limit his representation of debtors.[1] The Court stated:

> Mr. Palmer is one of only a few lawyers in this District who, in the opinion of the Court, has taken a questionable approach to representing bankruptcy debtors compared to other lawyers. While Mr. Palmer offered the above Debtors services to assist them in filing a petition for bankruptcy relief, he attempted to limit his responsibilities as counsel by declining to formally appear as the Debtors' attorney of record in the bankruptcy case. In other words, while he provided debtors with both pre- and post-bankruptcy legal advice and services, he made no appearances before the Court and his clients technically appeared *pro se*.

*Id.* at p. 3. Consistent with its concern over this process, regardless of the identity of the attorney, the Court in April and May, 2001 caused an "Order to Attorney" to be issued to Counsel in each of the above 19 cases, because the documents filed in these cases indicated an approach similar to that taken by Mr. Palmer.[2]

Chief Judge Pappas in this Order explained that inadequate information existed in the record to allow the Court to determine whether the amounts received by Counsel were reasonable under the circumstances. Counsel was therefore required to explain the nature and extent of services he rendered and his charges therefore, and to show that the same represented "reasonable compensation for the actual, necessary services rendered" or "reimbursement for actual, necessary expenses" as provided in § 330(a). The Order was entered under the authority of § 329(b) and Fed.R.Bankr.P.2017(a). *See also* § 105(a).

### B. Early litigation, and reassignment

The issuance of this Order led to a series of events which today need only be briefly summarized. Counsel filed motions to consolidate the cases, to require jury trial, and to recuse Judge Pappas. All were denied. Counsel's motion to enlarge the time for his provision of the required itemizations of services was granted. These several matters were followed by Counsel's Motion to Dismiss or Vacate Order to Attorney (the "Motion to Dismiss"). Thereafter, the Court on its own motion entered an Order of Partial Recusal in

---

1. *In re Jerame and Mindy Henderson*, Case No. 01–40309, Doc. No. 19 filed July 30, 2001. Though this Summary Order was simultaneously entered in four cases, the Court will hereafter refer to it as *Henderson*. This decision, and others discussed herein without formal citation, are available through the RACER function on this Court's Internet web site (http:/www.id.uscourts.gov/).

2. In particular, those documents included the petitions, the Rule 2016(b) disclosures, and the debtors' responses to questions posed on the statement of financial affairs.

May 2001, which assigned to the undersigned Judge responsibility for the Motion to Dismiss, and for the inquiry required under the original Order to Attorney.

Counsel did not then comply with the Order to Attorney but instead "renewed" the Motion to Dismiss and his motions to consolidate and for jury trial. By a comprehensive Order entered on June 22, 2001, this Court denied the Motion to Dismiss (and denied Counsel's "Supplemental Motion" raising several of the same arguments along with additional contentions); denied a motion to stay all proceedings (a request pressed on the theory that a separate "mandamus" action filed by Counsel was pending before the District Court);[3] denied the request for jury trial; and denied the request to consolidate the 19 cases, though allowing consolidation of hearings and some submissions to a limited degree given the similarity of issues. The Court granted Counsel yet another extension of time to provide the itemization of services rendered and fees and costs charged.

In late June, Counsel filed in each of these cases an "Itemization of Time and Costs as Ordered" (the "Itemizations"). The Office of the U.S. Trustee ("UST") replied to the Itemizations by written pleading. The panel trustee serving in each of these cases did not submit anything to the Court relative to the issues presented. None of the parties requested an opportunity to present evidence or argument at hearing.

The Court has reviewed, in detail, the submissions of Counsel and UST as well as the balance of the files and records in each of the cases. It today enters its decision on the several issues presented. By virtue of the fact that a contested matter is presented, this decision constitutes the Court's findings of fact and conclusions of law. Fed.R.Bankr.P. 9014, 7052. A separate Order, consistent herewith, will be entered.

## II. BACKGROUND AND FACTS

Though 19 separate cases are involved, their similarities far outweigh their differences insofar as the matters before the Court are concerned. Those similarities will be discussed at length. Specific facts in a given case which are both different and material will also be noted. Certain of the facts will also be set forth, or elaborated upon, in part III of this decision.

### A. The Disclosures

Counsel filed in each case—as he absolutely must—a Rule 2016(b) disclosure. Rule 2016(b) provides, in part:

> Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 15 days after the order for relief ... the statement required by § 329 of the Code[.]

Section 329(a) states:

> Any attorney representing a debtor in a case under this title, *or in connection with such a case,* whether or not the attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, *for services rendered* or to be rendered *in contemplation of or in connection with*

---

**3.** On September 27, 2001, Counsel filed a "voluntary motion to dismiss" that action,

Case No. 4:1–CV–193.

*the case* by such attorney, and the source of such compensation.

(Emphasis supplied).

Counsel previously contended that a Rule 2016(b) disclosure was not absolutely necessary. That position was rejected by both this Court and by the Bankruptcy Appellate Panel. *See Hale v. United States Trustee (In re Basham/In re Byrne)*, 208 B.R. 926, 931 (9th Cir. BAP 1997); *see also, Peugeot v. United States Trustee (In re Crayton)*, 192 B.R. 970, 981 (9th Cir. BAP 1996) (disclosure requirements of § 329(a) and Rule 2016(b) are mandatory, not permissive; failure to comply forfeits rights to compensation).

Counsel's disclosures, a modification of Procedural Form B 203, read as follows:

THE UNDERSIGNED, PURSUANT TO RULE 2016(b), BANKRUPTCY RULES, STATES THAT LIMITED SERVICES BY TOM HALE HAVE BEEN PROVIDED AS FOLLOWS:

(1) I certify that I am an attorney that has rendered a limited amount of PRE–FILING legal services PURSUANT TO LOCAL RULE 9010(e)(1)(2), to the above named Debtor(s). NO FURTHER SERVICES HAVE BEEN AGREED TO, OR CONTRACTED FOR, BETWEEN THE PARTIES.

(2) That the compensation paid for services rendered, to the Debtors in connection with a case under Title 11 of the United States Code, such payment or agreement having been made after one year before the date of the filing of the petition, is as follows:

(a) *$250.00* paid before the filing of said petition.

(b) Analysis of the financial situation, and rendering advice and assistance to the debtor(s) in determining wheth-

er debtor(s) may file a petition under Title 11, United States Code.

(c) Preparation of the petition, exhibits, schedules of assets and liabilities, statement of financial affairs, and other documents required by the Court to file.

(d) NO representation of the debtor(s), who have appeared pro se, at the § 341 meeting of creditors conducted by the Trustee, L.D. Fitzgerald.

(3) The source of the compensation paid was from earnings, debtor's WAGES, for services performed.

(4) The undersigned has not shared, or agreed to share, with any other person, any compensation paid by the debtor(s).

(5) The $200.00 filing fee will be paid by the debtor(s).

THE LAW CLINIC PROVIDES AN ALTERNATIVE TO DEBTOR(S) THAT ALLOWS DEBTOR(S) TO OBTAIN ACCESS TO THE FEDERAL DISTRICT BANKRUPTCY COURTS OF IDAHO BY FILING PRO SE. THIS ALTERNATIVE ALLOWS DEBTOR(S) TO FILE WITHOUT THE REQUIREMENT OF CONTRACTING WITH AN ATTORNEY TO REPRESENT THEM, IN A SIMPLE NO ASSET CHAPTER 7 BANKRUPTCY CASE.

I WELCOME THE OPPORTUNITY TO PROVIDE AN ALTERNATIVE TO. THE DEBTOR(S) THAT ALLOWS THEM TO FILE A CHAPTER 7 BANKRUPTCY, PRO SE, FOR A NOMINAL FEE OF $250.00.

*Id.* (capitalization in original).

Consistent with his approach to these cases, Counsel causes the petitions and related documents to be prepared for signature by the debtors. He does not sign

the petitions, nor does he appear as counsel in the cases.

## B. Earlier versions of the approach

This is not the first time that Counsel's "alternative" has come before the Court. *See Basham,* 208 B.R. at 928–29 (discussing attempt to limit services; debtors filing *in propria persona;* Counsel assisted by a disbarred lawyer as an "intern"). In addition to rejecting Counsel's suggestion that Rule 2016(b) was not mandatory, the Panel also affirmed this Court's reduction of Counsel's fees due to his failure to keep and provide contemporaneous time records, and because Counsel failed to provide competent and "complete" representation. *Id.* at 932–33.

Comparing the Panel's decision to the present cases indicates that there are some differences between the approach then taken by Counsel and that he now says he employs. For example, in both the Bashams' case and the chapter 7 case of the Byrnes, Counsel did not file Rule 2016(b) disclosures until the Court forced the issue. Here such disclosures, albeit editorialized, were filed. In all but two of the instant cases, they were timely filed.

The Bashams' bankruptcy was a chapter 13 case. All of today's cases are chapter 7

liquidations, save one.[4] The Rule 2016(b) disclosures and the subsequent submissions of Counsel profess an intent to limit his representation to debtors with "simple no asset chapter 7 bankruptcy case[s]." *See, e.g.,* Rule 2016(b) disclosures, at p. 2.[5]

The concerns of the Court addressed in this decision are serious enough in "simple" liquidations. They are heightened in regard to chapter 13 cases, where debtors are left to navigate the reorganization process with only limited pre-petition advice.[6] *See In re Dunnagan,* Case No. 01–40314, Memorandum of Decision re Order to Show Cause, Doc. No. 25, filed June 22, 2001, discussed *infra.*

Another difference is that, in the 1995 cases addressed by the Panel, Counsel would "charge extra" for attending the § 341 meeting of creditors. 208 B.R. at 929. Now Counsel's representation of his clients at the first meeting of creditors is not merely subject to the disincentive of an additional charge, it is expressly excluded. *See* Rule 2016(b) disclosure, at ¶ (2)(d), p. 1.[7]

Therefore, though certain aspects have changed, Counsel's approach is still much the same as that addressed by the Panel. For the most part, the differences can be

---

4. *See* Brent and Shawna Turner, Case No. 01–40625. These chapter 13 debtors represented themselves in defending a stay relief request and a motion of the trustee to dismiss, before amending their plan and obtaining confirmation. By virtue of the "partial" nature of the recusal, Chief Judge Pappas presided over such matters.

5. In the 18 of 19 cases which are chapter 7 liquidations, a no asset report was in fact filed by the trustee. How "simple" the cases were cannot be fully gleaned from the pleadings of record and the dockets. However, in virtually all cases amendments to schedules and statements were required, and in one case trustee brought an adversary proceeding objecting to discharge.

6. The Itemization filed by Counsel in the Turners' chapter 13 case, No. 01–40625, reflects the only services subsequent to the April 10 filing date were 68 minutes of conferences with Debtors and 75 minutes for attending the creditors' meeting. Such post-petition services preceded the § 362(d) and § 1307(c) motions, amendment of the plan, and confirmation.

7. Counsel nevertheless indicates in his Itemizations and other submissions that either he or his interns "attend" those meetings on a "pro bono" basis. This is discussed further, *infra.*

viewed as ones of degree. Despite the objections and concerns previously voiced by this Court and the Bankruptcy Appellate Panel, Counsel's vision of an "alternative" remains undimmed, and his efforts to advance the idea of severely limited representation are undiminished. That the Court would be forced to revisit the issue was unavoidable.[8]

### C. The Itemizations

The Order to Attorney required Counsel to file:

> ... a verified, written itemization of all services rendered to said Debtors and of all costs incurred. Said itemization shall include, at a minimum, a detailed and specific description of each individual item of service rendered; the day said services were rendered; the time expended in rendering each individual service in increments no larger than tenths of hours; and, if any of the services were rendered by any person other than said attorney [*i.e.*, Counsel], the name, address and professional or other qualifications of the person rendering the services, together with a detailed explanation of any agreement that exists between said attorney and said person for payment for any of said services. The itemization shall also include a de-

tailed accounting of all charges made on account of, and payments received from, said Debtors including the date and amount of any charge or payment.

Order, at p. 1–2. That Counsel had to keep such contemporaneous time records, and provide them to demonstrate the reasonableness of his fees, was expressly decided in *Basham.*[9]

On or about June 29, after the procedural maneuvers outlined earlier in this decision, the Itemizations were filed in each of the 19 cases. There are several factual assertions, repeated verbatim in each of the Itemizations, immediately preceding Counsel's provision of date and time entries regarding services rendered in his representation of that particular debtor. *Id.* at p. 1–2. Counsel expressly makes his declarations in the Itemizations "under a penalty of perjury." *Id.* at p. 3. The affirmations include the following:

— Counsel is a sole practitioner, with no paid staff to assist in his practice.

— His rate is $125.00 per hour.

— When he prepares a bankruptcy, he fully explains the documents to his clients in sufficient detail to avoid future misunderstandings.

— Counsel renders his services to

---

8. Certain similar issues involving Counsel were heard by the undersigned in 1998, sitting in the stead of Judge Pappas. Counsel appears to argue that the resolution of those matters validated his approach or established the presumptive (or even conclusive) reasonableness of his fees. Though neither the Court nor the UST are likely to agree with Counsel's characterizations of those hearings, the point raised by Counsel is of no moment. The Court has the ability to reconsider its prior decisional law, and should do so if intervening events and development of law indicate that revision or clarification is appropriate. *In re Estes*, 254 B.R. 261, 263, 00.4 I.B.C.R. 187, 188 (Bankr.D.Idaho 2000). Counsel has, through the process used in

these 19 cases, been provided ample opportunity to justify his position.

9. *Id.* at 932, quoting from *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) ("[F]ee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."); and at 932, citing *In re Martin*, 197 B.R. 120, 126 (Bankr.D.Colo.1996) and stating that "Absent the opportunity to review Hale's contemporaneous time records, the bankruptcy court could properly deem his fees unreasonable and excessive."

debtors through a law clinic[10] that provides low income debtors a no asset chapter 7 bankruptcy for a $250.00 flat fee.

— His "interns" receive his direct supervision, and are not allowed to have any client contact that he doesn't directly supervise and monitor. ·

*Id.*

Counsel then proceeds to set out the time spent and costs incurred in each case. In doing so, he simply identifies a date on which services were performed, the number of minutes expended, and he describes the services rendered by way of an abbreviation "code". By way of example, the following are the services rendered in the bankruptcy of Lynda Hansen, Case No. 01–40696:

| | |
|---|---|
| 3–26–01 CD | 4 [minutes] |
| 3–30–01 CD | 5 |
| 4–3–01 ML | 10 |
| 4–3–01 RV | 13 |
| 4–3–01 CD | 30 |
| 4–5–01 CD | 15 |
| 4–5–01 PR | 135 |
| 4–5–01 CY | 20 |
| 4–6–01 ML | 12 |
| 4–10–01 CD | 18 |
| 4–10–01 CCR | 4 |
| 4–11–01 CCR | 3 |
| 4–15–01 CD | 14 |
| 5–24–01 CD | 10 |
| 5–25–01 MTG | 60 |
| 6–10–01 CD | 7 |
| 6–11–01 ML | 9 |

| | |
|---|---|
| 6–11–01 PR | 7 |

TOTAL 390 X $2.08 = $811.40
COSTS $127.90
TOTAL (QUANTUM MERUIT) $939.30

*See, id.,* Doc. No. 21, at p. 2.[11]

Counsel provides a key to the abbreviations he uses in "my timekeeping records." That key establishes:

| | |
|---|---|
| CD | conference with debtor |
| CCR | conference with creditor |
| MTG | attendance at the § 341 hearing (pro bono) |
| RE | research, including access to court records to determine conflicts, previous filings |
| CY | copy documents |
| RV | review documents, and other records provided by debtors |
| PR | prepare documents for the debtors, matrix, voluntary petition, all schedules and related filing documents |
| CS | costs for out of pocket expenses |
| ML | time spent picking up mail or posting mail. |

*Id.*

Each of the 19 Itemizations purports to establish a total time commitment which, at a rate of $125.00 per hour (shown at $2.08 per minute) for the coded entries, would yield a "quantum meruit" amount well in excess of the $250.00 charged.[12]

## III. DISCUSSION AND DISPOSITION

■ Determining whether Counsel's $250.00 fee is "reasonable" within the

10. Counsel specifically avers that he is "a tenured Professor at Idaho State University and the pre-law advisor responsible for running a law clinic that provides low income debtors a $250.00 flat fee for a no asset Chapter 7 bankruptcy." It thus appears to the Court that several additional questions could be posed. For example, is it the clinic which contracts with the debtors? Are undergraduate college students providing legal advice and services to consumers under the guise of "interns" in the clinic? Does Counsel conduct personal business, from the University campus or elsewhere, utilizing student labor? The Idaho State Bar and ISU may have cause for concern. This Court today only addresses the "clinic" situation as it relates to bankruptcy issues, and does so only to the extent possible under the present evidentiary record.

11. These entries actually total 376 minutes, and Counsel's total is overstated. The Itemizations are rife with similar math errors.

12. *Quantum meruit* is a phrase used to describe a measure of damages to compensate a party in an implied contractual relationship. *See, e.g., Bingham Memorial Hospital v. Boyd (Matter of Estate of Boyd),* 134 Idaho 669, 8 P.3d 664, 668 (App.2000). Here Counsel has taken the position that his express contract with the debtors provided for services, though limited, in return for $250.00. The question before the Court is whether under all the facts and circumstances this fee charged was reasonable. Correctly used, the term *quantum meruit* is inapplicable.

Code's use of that term requires an evaluation of both Counsel's approach to representing debtors and an evaluation of the Itemizations themselves, which were submitted in an attempted justification of that approach. The Court will first address several specific issues raised by the record, including the Itemizations, and then turn to the more overarching concerns regarding Counsel's attempts to limit his professional responsibilities to his debtor-clients.

## A. Failure to sign the petition

*In re Merriam,* 250 B.R. 724 (Bankr. D.Colo.2000), considered at length an attorney's failure to sign the petitions he prepared in the course of "limited" debtor representation somewhat similar to Counsel's. It expressly held that, regardless of the propriety of the attempt to limit the scope of representation, the attorney was absolutely obligated to sign the petition under Fed.R.Bankr.P. 9011(a). *Id.* at 732–37.[13]

■ This Court agrees that there is no excuse for a lawyer, who counsels a debtor regarding a bankruptcy and prepares that debtor's petition, schedules and related documents, to fail to sign the petition.[14] The attorney is responsible for what appears in such pleadings, and his signature is a required certification under Rule 9011(b). The argument that some or all post-filing services are to be contractually limited does not obviate the attorney's duty to sign what he caused to be prepared, nor does it modify the scope of his accountability under the Rules for the representations made in and by the pleadings.

■ This Court would disagree, however, with the concept that this defect is a "technical breach" and easily corrected by filing an amended and signed petition. *Id.* at 737. Ninth Circuit authority indicates that violation of applicable rules related to appearances and compensation can support denial of compensation. *See, e.g., Law Offices of Nicholas A. Franke v. Tiffany (In re Lewis),* 113 F.3d 1040, 1045 (9th Cir.1997). This Court views the failure to sign a petition to be as serious as the failure to file a Rule 2016(b) disclosure, which can alone be grounds for denial of compensation and an order requiring disgorgement of all fees. *Basham,* 208 B.R. at 931; *Crayton,* 192 B.R. at 981.

However, Rule 9011 not only imposes requirements, it provides a procedure for enforcement. Among other things, an attorney is entitled to notice of, and an opportunity to address, the alleged violation. *See* Rules 9011(c)(1)(A), 9011(c)(1)(B).[15] Inasmuch as nothing in the Court's Order to Attorney referred to or incorporated Rule 9011, or advised Counsel that the show cause process under § 329 and Rule 2017(a) was inclusive of the process provided for under Rule 9011(c)(1)(B), the Court

---

**13.** The court concluded, however, that the UST's invocation of § 329(b) as a source of remedy for this violation was misplaced, as that section focused on the attorney's duties to the client and not obligations owed to the Court or legal system which obligations could be enforced under Rule 9011's own mechanisms. *Id.,* at 736–37.

**14.** Preparing pleadings for a party who will then appear unrepresented has been characterized by some as "ghostwriting." Courts generally disapprove of such conduct and find it sanctionable. *See id.,* 250 B.R. at 733.

**15.** If, for example, the UST believes that an attorney's conduct violates Rule 9011 in addition to supporting reduction or denial of compensation under §§ 329 or 330, a separate motion as to the Rule violation is required under Rule 9011(c)(1)(A). (The 21 day "safe harbor" provisions of that subdivision of the rule would also apply unless the violation was in regard to the petition itself. *Id.*) However, nothing would prohibit two motions, and a consolidation of hearings on the matters.

will today exclude the question of sanction under Rule 9011 from its analysis.

### B. Evaluation of the representations made

#### 1. Meeting the burden of justification

Counsel bears the burden of justifying his charges under § 329(b). It is the same burden as he bears when demonstrating an entitlement to fees under § 330. *American Law Center, P.C. v. Stanley (In re Jastrem),* 253 F.3d 438, 443 (9th Cir.2001); *Basham,* 208 B.R. at 931–32; *Pfeiffer v. Couch (In re Xebec),* 147 B.R. 518, 524 (9th Cir. BAP 1992). Failure to meet this burden supports reduction or denial of the compensation sought. *Id.; Lewis,* 113 F.3d at 1045. The bankruptcy court has wide discretion in determining reasonable compensation. *In re Columbia Plastics, Inc.,* 251 B.R. 580, 584–85 (Bankr. W.D.Wash.2000), citing *In re Financial Corp. of America,* 114 B.R. 221, 224 (9th Cir. BAP 1990), *aff'd,* 946 F.2d 689 (9th Cir.1991).

#### 2. Inadequate description

A starting point for an evaluation of the reasonableness of the fees is an explanation that discloses what was done, when it was done, by whom it was done, and how long it took (*i.e.,* a description of the "actual ... services rendered"). § 330(a)(1)(A), § 330(a)(3)(A). Time entries must be both detailed and specific. *In re Grosswiler Dairy, Inc.,* 257 B.R. 523, 528 (Bankr.D.Mont.2000) (the description of services performed must include, at a minimum, the parties involved and the nature and purpose of each task). A lack of detail justifies reduction or denial of compensation. *Id.; see also, In re Jordan,* 00.1 I.B.C.R. 46, 48 (Bankr.D.Idaho 2000), citing *In re Ginji Corporation,* 117 B.R. 983, 993 (Bankr.D.Nev.1990); *In re Pinkins,* 213 B.R. 818, 824–25 (Bankr. E.D.Mich.1997).

Simply referencing generic categories of services by way of an abbreviation code does not meet this burden. It does not provide the required detail, and impedes a reasoned analysis of the value of those services. By way of example, "CD" is not equivalent to "office conference with debtor re: request of Sears for reaffirmation." The entry "CCR" is not the same as "telephone conference with First Bank VISA card representative re: stay violation from continued billings." Stating "PR" does not adequately convey "prepare amended schedule C to comply with trustee's demand and LBR 4003.1, and amended statement of financial affairs in currently required form." [16]

Counsel's Itemizations failed to provide the degree of detail and specificity required by case law. They also failed to meet the express requirements of the Order to Attorney. This supports denial of compensation and, by extension, supports reduction in compensation. The Court, under the entirety of the circumstances, nevertheless believes it appropriate to consider and address additional issues raised by Counsel's conduct and by his Itemizations.

#### 3. Entries reflecting noncompensable services

Counsel attempts to bolster the idea that his $250 fee is reasonable by making

---

16. Counsel has asserted that provision of detail in time entries implicates, if not violates, the "attorney-client privilege" and that this either excuses the omission of detail or justifies extension of time in order to obtain a debtor's "waiver" of the privilege in order to file the necessary itemizations under § 329 or § 330. Counsel has yet to establish that this assertion is meritorious.

note of the many services he allegedly performs. In doing so, however, he includes services which are not compensable at all.

■ Lawyers, or paralegals for that matter, may not charge professional rates for clerical functions. *In re Haskew*, 01.2 I.B.C.R. 62, 65 (Bankr.D.Idaho 2001); *Jordan*, 00.1 I.B.C.R. at 48; *In re Good*, 97.2 I.B.C.R. 42, 43 (Bankr.D.Idaho 1997). *See also, Grosswiler Dairy*, 257 B.R. at 529; *Columbia Plastics*, 251 B.R. at 588; *Pinkins*, 213 B.R. at 824; *In re Bank of New England Corp.*, 134 B.R. 450, 455 (Bankr. D.Mass.1991), *aff'd*, 142 B.R. 584 (D.Mass. 1992) ("[I]f the service performed by a paraprofessional consists of typing, data entry, checking court dockets or court dates, manually assembling, collating, marking, processing, photocopying or mailing documents, the task is clerical in nature and not compensable.")

■ Counsel's Itemizations include charges in the categories of ML ("time spent picking up mail or posting mail") and CY ("copy documents"). While it may be true that Counsel "has no paid staff" (*see* Itemization, at p. 2), this does not mean that he may charge a lawyer's rate to run to the mailbox or stand at the copier.

### 4. Preparing documents

■ Counsel's Itemizations, taken at face value, indicate that he personally prepares petitions, schedules, statements and the other documents required for filing.[17] While legal services are involved in determining what should be included on those documents and how it should be shown, and thus be compensable at professional rates, the mechanical process of preparation of the documents is clerical and not compensable. *Haskew*, 01.2 I.B.C.R. at 65; *Grosswiler Dairy*, 257 B.R. at 529, citing *Columbia Plastics*, 251 B.R. at 589 (neither word processing nor completing blanks in standard bankruptcy form is compensable).

■ It might be argued that the time shown on each of the Itemizations under this category reflects both the lawyerly process of determining what to say and the clerical process of saying it, and that some portion is therefore properly compensable. However, this cannot be determined from the entry itself.[18] Counsel bears the burden of providing sufficient detailed information to establish entitlement, and has failed to meet that burden. The Court need not indulge in guesswork to justify a fee for an applicant. *Pinkins*, 213 B.R. at 825, citing *In re Taylor*, 66 B.R. 390, 393 (Bankr.W.D.Pa.1986); *see also, J.F. Wagner's Sons Co.*, 135 B.R. 264, 267 (Bankr.W.D.Ky.1991).

An additional problem is presented in regard to document preparation. In almost all of the cases, amended schedules were required by the trustee or Court in order to comply with the Rules, correct errors or inconsistencies, or provide necessary detail. And in 13 of these 19 cases filed in 2001, an amended statement of

---

**17.** The references to *"my* timekeeping records" and the use of the $125.00 per hour ($2.08 per minute) rate constitute an affirmative representation that Counsel *personally* performed all the services set out in the Itemizations with that per minute fee.

**18.** By way of example, Counsel charges 135 minutes (2.25 hours) for "PR" prior to filing in Lynda Hansen's case. Ms. Hansen's schedules disclosed no real property, $1,200 of personal property, no secured or priority unsecured creditors, four general unsecured creditors holding $14,000 of claims, and a straight-forward budget. Nothing of note appears on her statement of financial affairs. These pleadings do not therefore reflect the reason for such a time commitment exclusive of manual document preparation.

financial affairs had to be filed because Counsel used a form which had been superseded in October, 2000. This indicates that certain of the pre-filing "PR" charges, and post-filing charges under that category to correct defects, should not be considered reasonable or compensable.[19]

### 5. The use of "interns"

Counsel indicates in his submissions that "interns" assist in his practice, and his Rule 2016(b) disclosures indicate they have "client contact" which Counsel says he supervises. However, in only eight of the 19 Itemizations is there any indication whatsoever that services of any nature were performed by interns. In these eight cases,[20] the Itemizations show that two

interns attended the § 341 meeting, at 55 to 60 minutes for each meeting, at an asserted value to debtors of $60.00 per hour.[21] All eight of these first meetings occurred on June 8, 2001.[22] There are no other entries in the Itemizations indicating that interns, rather than Counsel, performed any of the described work.[23]

### a. The June 8 creditors' meetings

Collectively, the time allegedly spent by the interns at the June 8 meetings totals 7 hours and 35 minutes. However, the calendar for the creditors' meetings held that date reflects a different story.[24] There were ten cases scheduled for hearing at 8:00 a.m. that day, none of which are here involved. Three of the instant cases were

---

19. There is yet one more document preparation problem evidenced by the records. In the case of Michael Castorena, No. 01–40473, the debtor filed an application to pay his filing fee in installments. *Id.* at Doc. No. 2. The 2016(b) disclosure and other pleadings indicated that Counsel's $250.00 fee was paid prior to filing. This violated Fed.R.Bankr.P. 1006(b)(3), which provides:

> (3) **Postponement of Attorney's Fees.** The filing fee must be paid in full before the debtor or chapter 13 trustee may pay an attorney or any other person who renders services to the debtor in connection with the case.

Counsel's taking a fee, while assisting debtor in applying for leave to pay the filing fee in installments (and even having debtor sign a false certification in that application that no payments to lawyers had been made) is improper and unreasonable, and itself supports denial and disgorgement of fees in this case.

20. Case No. 01–40877 (Allen), Case No. 01–40822 (Christen), Case No. 01–40823 (Ellis), Case No. 01–40824 (Oneil), Case No. 01–40855 (Wilkinson), Case No. 01–40856 (Mitchell), Case No. 01–40857 (Nolan), and Case No. 01–40876 (Haney).

21. This is apparently the value for both interns' attendance.

22. Among the myriad issues raised, the interns' "substituted" appearance on June 8

belies Counsel's assertion that his interns are not allowed to have any client contact that he doesn't directly supervise and monitor. Itemizations, at p. 3.

23. Though the Itemizations contain no disclosure that interns delivered any of the specifically described services other than attendance at the June 8 first meetings of creditors, a comment in Counsel's "Supplemental Motion" indicates that "debtors received three (3) or more calls *from my office*, at an average of twenty minutes per call, after entering into a contract for my legal services . . . ." *Id.* at p. 2, item 3 (emphasis supplied). These calls were for the purpose of "gathering facts necessary to review what chapter to file, facts needed to file, and all issues related to the proper preparation of the legal documents." *Id.* And, as noted previously, the Rule 2016(b) disclosures indicate interns have client contact, though Counsel alleges he personally supervises and monitors that contact. The Court must conclude that interns have rendered services to debtors. The question is whether such time has been excluded completely from the Itemizations, or whether intern services are shown in the Itemizations but are billed at Counsel's $2.08 per minute.

24. That calendar was obtained by the Court from its systems and noticing personnel, and a copy is attached to today's decision as filed in Case No. 01–40473.

among eleven cases scheduled for hearing at 9:00 a.m., three more were among ten cases scheduled at 10:00 a.m., and the last two were among fourteen cases scheduled for 11:00 a.m. hearing. In all, Counsel claims almost a full work day in time spent by interns for what actually consumed at best some minor share of about three hours. It's also claimed that his interns spent an hour on each case, when the calendar indicates several of Counsel's cases were heard in groups of cases within a one-hour time frame.

Counsel also claims 55 or 60 minute increments for each of the first meetings he personally attended. The Itemizations reflect, for example, that Counsel attended seven § 341(a) meetings on June 1, and he charged 7.25 hours for those meetings. The Court must conclude the same sort of overstatement exists.[25]

### b. The rate for interns

■■■ Counsel argues that his "interns" provided value in attending the June 8 creditor meetings, and that value should be measured at an effective rate of $60.00 per hour. He has utterly failed to justify that any rate is appropriate for these individuals, much less the amount of that rate. *See Grosswiler Dairy*, 257 B.R. at 529. The qualifications of any of these unnamed individuals[26] to provide legal or paralegal services, even if supervised, is not established in any sense. *See Columbia Plastics*, 251 B.R. at 589 (in addition to proving that compensable paralegal tasks were performed, applicant must show individuals performing such tasks had the necessary legal training or substantive and procedural knowledge to charge time on bankruptcy files). *See also, Henderson*, at p. 7 (without proof to show that the individual qualifies as a paraprofessional, he must be treated as no more than an experienced clerical aide, and costs attributable to such services must be absorbed in attorneys' overhead, not valued separately).

### c. Delivery of legal services by interns

The Court has concerns, from the entirety of the record in these cases, that legal services were in fact delivered to the debtors by the "interns" and not by Counsel personally. While the itemized time is all charged at $2.08 per minute, reflective of Counsel's lawyer rate of $125.00 per hour, the Court is not persuaded that Counsel personally conducted all the conferences with the debtors, in person or by phone, and did all the other work, including that of a clerical nature, that is described in the Itemizations. If this were the case, why claim that his interns "are not allowed to have any client contact, that [Counsel] does not directly supervise and monitor"? Indeed, if this is true, why have any interns at all? Nor is it shown how Counsel could or did personally supervise and monitor every face-to-face or telephone conversation between an intern in his "clinic" and a debtor.[27]

---

25. Perhaps some of the examinations were unusually lengthy. If so, Counsel fails to show it. Perhaps the one hour charge is inclusive of conferences with debtors, the trustee, and/or creditors who appeared. If so, Counsel fails to specify and separately describe such work.

26. The Order to Attorney commanded "if any of the services were rendered by any person other than said attorney, [Mr. Hale shall provide] the name, address and professional or other qualifications of the person rendering the services, together with a detailed explanation of any agreement that exists between said attorney and said person for payment for any of said services." He did not do so.

27. *Pinkins* found that an attorney's review of paralegal work is not alone sufficient, and that personal contact of the attorney with the client is critical to the delivery of legal services. A lack of such direct attorney-client contact precludes a proper delegation of tasks

Of course, if the interns are the ones providing services in the categories of "CD", "PR", "ML", "RV" and so on, then the assertion of that time as Counsel's own time (by virtue of using Counsel's rate thereon) is false. A false statement has serious consequences, not the least of which is denial of compensation. *Lewis,* 113 F.3d at 1045–46 (affirming bankruptcy court disallowance of fees where counsel included a false statement in application for employment); *see also, In re Park–Helena Corp.,* 63 F.3d 877, 882 (9th Cir. 1995) (even negligent or inadvertent failure to disclose fully relevant information in Rule 2016 statement may result in denial of all requested fees).

Still, despite the several assumptions which could be reasonably drawn from the record, no direct evidence was presented regarding the delivery of legal advice to debtors by interns, whether monitored and supervised or left to their own devices.[28]

This Court, like most others, has recognized that bankruptcy lawyers can use paraprofessionals to assist them in rendering legal services to their clients. *See, e.g., Dunnagan* at 14; *Jordan,* 00.1

I.B.C.R. at 48. However, in doing so, several conditions must be met. The paralegals must be qualified through training and experience, and capable of performing those functions. They must be adequately supervised.[29] Paralegals may not independently provide legal advice, and can legitimately be delegated work only after the attorney has met with the client, determined what tasks need to be performed, and determined who may competently perform those tasks. And when compensation is sought for paralegals' services under § 329 or § 330, the work done must be itemized in detail and the rate charged must be justified.

In this case, a host of issues are presented regarding the use of interns, the qualification of interns, the rate of compensation of interns, and even the veracity of the allegations as to what the interns did and what Counsel did. The burdens placed on Counsel to explain and support his charges are not met.

If it were shown that the debtors were for practical purposes "represented" by the intern or paralegal alone, and that

by the attorney to the paralegal. 213 B.R. at 822–23. *See also, Hessinger & Associates,* 192 B.R. 211, 222–23 (N.D.Cal.1996) (inadequate supervision of paralegals results in their unauthorized practice of law, and supports review and sanction of attorney's conduct).

28. Without meaning to be unduly critical, the Court must note that the trustee and the UST have not provided much assistance in this inquiry, despite rather obvious interests they must have in the outcome. No evidence was generated (or, at least none was provided) as to relevant or potentially relevant facts, many of which would seem relatively easy to ascertain by just interviewing the debtors. For example, did Counsel personally meet with these debtors? When, and for how long? Was it in person or by phone? Who else met with the debtors? Who assisted the debtors in answering their legal questions? Who advised them regarding choice of chapter, their

duties, their exemption rights, dealing with creditors, the protection of the stay, discharge, or a host of similar issues? Who appeared at each of the first meetings? What did that individual do there? How long did these meetings take? Were there problems that arose in the cases that debtors had difficulty addressing because they were not represented?

29. *See* "Model Guidelines for the Utilization of Legal Assistant Services" as adopted by resolution of the Idaho State Bar in 1992, reported at Idaho State Bar Deskbook, p. 332–38. *See also* Idaho Rules of Professional Conduct at Rule 5.3 (Responsibilities Regarding Non-lawyer Assistants) and Rule 5.5(b) (prohibition on assisting nonlawyer in activities which would constitute unauthorized practice of law). *Accord, In re Bright,* 171 B.R. 799, 805 (Bankr.E.D.Mich.1994).

these interns counseled and advised debtors, made judgments as to what should be shown in the pleadings and how, spoke with creditors on the debtors' behalf, and so on, not only would fees be lost but other sanctions potentially appropriate.[30]

However, as with so many of the issues which spring from the record in these cases and Counsel's approach to practice, these concerns must await a more developed evidentiary record before a final resolution can be reached. In the event evidence is adduced in future cases which sheds more light on these questions, the Court can consider them further.

### d. Fee splitting

Counsel declares in the Itemizations that he has "no paid staff." Counsel in his Rule 2016(b) disclosures certifies that he "has not shared, or agreed to share, with any other person, any compensation paid by the debtor(s)." *Id.* at ¶ 4, p. 2. Counsel, however, failed to respond to that portion of the Order to Attorney which required explanation of what was paid to others who assisted him in providing services to the debtors. *See* n. 26, *supra.*

One might conclude that the interns from the University are donating their time and services to the economic benefit of Counsel. Though Counsel "charges" for the interns' labor on June 8, nothing is said as to whether the students receive any part of the $250 fee.

*Basham* indicates that Counsel has in the past used a former lawyer, since disbarred, as an intern. Certain of Counsel's submissions in these cases reflect that this individual is still acting as an intern for Counsel. *See, e.g.,* Motion to Dismiss, at p. 1.[31]

If Mr. Williams is providing such services, then only one of two things can be true. Either he (perhaps like the students) is not being paid anything at all, or he is being paid something. If the latter (and this would appear to be a fact readily capable of discovery and proof), Counsel's statements in the Itemizations and in the disclosures would be untrue, and a fee splitting issue presented. *See In re Bass,* 227 B.R. 103, 109–10 (Bankr.E.D.Mich. 1998); *see also,* Idaho Rule of Professional Conduct 5.4(a); *Dunnagan,* at p. 18, n. 10.

For today's purposes, though, it can be observed that Counsel has not adequately described, justified or supported the propriety of charging for any intern services. Though other issues are clearly implicated, the Court must ultimately reserve judgment on those issues pending a more fully developed record.

### 6. Charges for attending creditors meetings

 Counsel attempts to justify his charges in part by noting that he "attended" eleven of the § 341 meetings, at which the debtors purportedly appeared *pro se.*

The Rule 2016(d) disclosure is unequivocal that "no further [*i.e.,* post-filing] services have been agreed to, or contracted for" between Counsel and the debtors. *Id.* at ¶ 1. However, the Itemizations all contain reference to "MTG" with an ascribed

---

30. *See, e.g., Pinkins,* 213 B.R. at 820–23 (discussing how inadequately supervised paralegals advising bankruptcy debtors were engaged in unauthorized practice of law, and how allegedly "supervising" attorney failed to meet applicable rules of professional conduct; all compensation for paralegals denied); *Hessinger & Associates,* cited *supra* at n. 27;

*Bright,* 171 B.R. at 802–03 (addressing what conduct of paralegal would constitute unauthorized practice of law).

31. Counsel there states that "[The Order to Attorney is an attempt] to persuade me to disassociate myself from Mr. Joseph L. Williams II, an intern at my law clinic."

value at either Counsel's rate or that of the interns. The term "MTG" is defined by Counsel as "attendance at the § 341 hearing (*pro bono* )."

Several questions come to mind. Why show a charge if the time, service or assistance is allegedly provided *pro bono?* [32] Can any charge for legal services be appropriate if there is no appearance as legal counsel? Can he advise the debtors during their examination if he does not represent them? Have the debtors recourse if they respond unwisely to the questions of the trustee or creditors based on advice thus received? How can Counsel claim an entitlement to actual and necessary legal services under §§ 329 or 330 where he is not, at the time such services are rendered, their lawyer and not then accountable—to his client, their opponents, other counsel, or the Court—as a legal representative?

Counsel may believe he is providing comfort to debtors by being elsewhere in the hearing room, though the Court views that as likely small comfort indeed. But more importantly, this Court cannot conclude on the record presented that any legal service is rendered by that act.[33]

Counsel has not shown that, under his suggested approach, these "MTG" charges should be considered as supporting the

reasonableness of his fee. This is in addition to the problems with overcharging for these meetings, or allowing interns to substitute at these meetings, as discussed above.

### 7. Other post-petition services

The Rule 2016(b) statement recites, at some length, that the contract between debtors and Counsel is for "limited" assistance in preparing for a bankruptcy filing, after which the debtors will represent themselves *pro se*. No post-filing services of any nature are "agreed to or contracted for." But while Counsel thus disavows any responsibility to appear or act as the debtors' legal representative after the filing occurs, he attempts to justify the fee for his "limited" representation by detailing services allegedly rendered, post-petition, in just such a role. Thus, in addition to all the other problems with his chosen course, there is no basis for considering any services rendered after filing as supportive of the reasonableness of the flat rate.[34]

### 8. Costs

In addition to services, the Itemizations claim certain out of pocket costs were incurred. But according to the Rule 2016(b) disclosures, Counsel charges a "flat fee" of $250.00 and does not charge separately for

---

**32.** The term *pro bono* is a shortened version of the phrase *pro bono publico* (for the public good), and is defined as "being or involving *uncompensated* legal services performed." Black's Law Dictionary (7th ed.1999), at p. 1220–21 (emphasis supplied). While disclosure of the fact the service was rendered is proper, asserting a charge for it is inconsistent with the representation of its *pro bono* nature.

**33.** It is even less of a benefit, and in no sense compensable, when the unsupervised interns attend rather than Counsel. Add to this the fact that well over 7 hours of time is billed by interns on a single day (June 8) for eight first

meetings which occurred only in the morning hours, and were but eight of 45 cases that morning, and it becomes apparent that not only is the charge unjustified, it is falsely inflated.

**34.** Post-petition work includes amending pleadings and conferring with the debtors. However, Counsel also asserts that he had post-petition conferences with creditors ("CCR") even though at the time of such communications he was not, by his own design, the debtors' lawyer. *See,* Case No. 01–40804 (Wells); Case No. 01–40806 (Baker); Case No. 01–40822 (Christen).

any costs. Such costs are therefore irrelevant to the present inquiry. Were the Court to consider and evaluate such costs as a component of the "reasonableness" of the flat fee, it would observe that certain of the costs are unsubstantiated. This is particularly true in regard to the cost of $1.00 per page to generate 55 to 60 pages of bankruptcy forms Counsel provides his clients. The rate is allegedly based on costs for "toners, drums, paper, maintenance" related to the production of these materials. That assessment is unproven. *In re Young*, 98.2 I.B.C.R. 43 (Bankr.D.Idaho 1998), citing *Sousa v. Miguel (In re United States Trustee)*, 32 F.3d 1370, 1374–76 (9th Cir.1994).

### C. Might the services, after all adjustments, be reasonable?

If one deletes all the clerical work such as copying, mail runs, docket review, and document preparation; deletes the intern charges; deletes charges for first meeting attendance and other post-petition services; and deletes the costs, does the remainder of the work, allegedly performed personally by Counsel, meet the test of reasonableness?

It might be thought that this would be an easy challenge. The rate of $125.00 per hour for Counsel has not been contested by the U.S. Trustee, nor has evidence been introduced on the point. At such a rate, it would take only two hours of work to meet the threshold for making an argument of reasonableness of a $250.00 fee on a lodestar basis. The Court concludes, however, that unreasonableness of fees is not solely a question of overcharging; it can also be a question of underperforming.

Three significant problems lead the Court to reject the proposition advanced by Counsel that his $250.00 fee is, under all the circumstances, a reasonable one.

The first was noted earlier. It is the lack of presentation of an application or itemization that provides the requisite, detailed information regarding his services. Not only did Counsel fail to make the showing required by the Code, rules and precedent, he also failed to comply with the unambiguous Order to Attorney.

The second is a basic question as to the accuracy and truthfulness of the assertions in the Itemizations. Allowing retention of the fees as "earned" on a lodestar basis requires an assumption as to Counsel's credibility, which is an assumption difficult to make on this record.

Counsel claims, by virtue of using his per minute rate, that *all* the itemized services reflect his personal labors. However, he has made it clear that his intention is to provide an "alternative" to low income debtors which, to some significant degree, depends on (or at the least includes) his utilization of the services of a once-licensed lawyer and college students as interns in his clinic. Other than showing the interns as attending the June 8 creditors' meetings, Counsel discloses no intern charges whatsoever. If the interns are not involved in the client conferences, document review, document preparation, research, and copying and mailing, what are they doing that would fulfill the clinic structure he promotes? [35] And if they are so involved, are there not equally serious concerns, for example that debtors are receiving their legal advice from individuals

---

**35.** It might be argued that the interns' time spent in conferencing, document review and preparation of pleadings is provided *gratis* and is therefore not included or shown in the Itemizations, though Counsel's time is. However, this idea is impeached by the disclosure of interns covering the June 8 first meetings. Also, if it is argued that the interns in fact do such work, Counsel must then show why his time entries are not excessive.

unqualified to provide it, or that Counsel's Itemizations are false or misleading?

Also impacting the question of credibility is the fact that, in his attempts to bolster the claims of reasonableness of fees, Counsel has included items which are patently noncompensable, items which are compensable if at all only at a lower rate and, in the case of the intern charges on June 8, inflated the actual time spent.

Still, the Court concedes that parties in interest, including the UST and trustee, have not provided direct evidence to establish that Counsel did not meet personally with debtors, that the debtors received legal advice from meeting with or calling the interns, or that other false averments of fact are made in the Itemizations.

So while credibility is a concern, it is not viewed or applied by the Court as a determinative factor. At bottom, credibility questions are simply symptomatic of Counsel's failure to sustain his burden to provide an adequate record regarding the facts and details of his delivery of legal services, and to prove the same to be reasonable, necessary and compensable.

The third problem is one which caused the Court to issue the initial Orders to Attorney, and which drives resolution of those Orders by way of today's detailed decision. It is the question of Counsel's attempt to limit the scope of representation.

### 1. Limiting the scope of services

This issue drew comment from the Panel in *Basham*, 208 B.R. at 932–33, which noted that Counsel "created a situation where he would have no responsibility for the outcome of [his clients'] cases" and held:

> The record supports the bankruptcy court's finding that the fees were unreasonable given the lack of contempo-

raneous time records and the failure to provide competent *and complete* representation of the Bashams and Byrnes. *Id.* at 933 (emphasis supplied). The same issue was foreshadowed in *Dunnagan:*

> In addition, in fairness, the Court understands [Mr. Palmer] that is not the only attorney in this District attempting to restrict the extent of the legal services provided to bankruptcy debtors, occasionally to the client's prejudice. Without doubt, an individual debtor has a legal right to forego counsel in a bankruptcy case. As yet, the Court has not been called upon to judge whether, consistent with the Bankruptcy Code and other law, an attorney may limit the services provided to a debtor in a given case. Hypothetically speaking, the Court presumes that some small number of debtors are sufficiently knowledgeable and sophisticated to adequately represent their interests in the complicated world of bankruptcy without a lawyer. On the other hand, even in what may at first seem the simple case, a debtor's quest for bankruptcy relief can be fraught with perils and pitfalls. Many debtors simply lack the skills necessary to avoid the risks they may encounter.
>
> A competent, ethical attorney is confronted with an extremely difficult, if not insoluble, dilemma when contacted by a client who is inclined to file for bankruptcy, but who, for whatever good reasons, does not want or can not afford "full-service" legal representation in the case. Can the attorney legally and ethically assist a client in prosecuting a bankruptcy case when the lawyer can not in good conscience conclude the would-be debtor is capable of analyzing, confronting and successfully overcoming the legal problems he or she may encounter in bankruptcy court? Is the lawyer at risk for any losses the debtor

may suffer? Is the lawyer's exposure limited to loss of fees?

Moreover, the Court is aware that frequently debtors are asked by the lawyers to agree to the limited nature of the representation arrangement. Is consent by the client to a lawyer's proposal to restrict services of consequence if the client is not equipped to appreciate the intricacies, and perils, associated with such a decision?

These are just some of the critical questions to be addressed by attorneys considering representing debtors without formally appearing in the bankruptcy case. It seems caution is in order.

*Id.* at p. 21–23.

The Court concludes that these questions are no longer rhetorical. Though attorney Palmer has modified his handling of cases to some degree,[36] the position taken by Counsel, at least as manifested in this record, is more obdurate. It appears to the Court that the issues are squarely presented. The Court can—and should—address questions of limiting the scope of representation, under the circumstances and to the degree here evidenced.

### a. Three recognized alternatives

Debtors have three options in pursuing bankruptcy relief. They may appear *pro se* (or *in propria persona*), representing themselves as best they can. This is often foolish and, in many cases, a fresh start for these debtors is frustrated. There are commonly errors committed in the handling of their cases, and also often errors of omission, *i.e.*, opportunities missed due to debtors' lack of knowledge. But these individuals have the right to represent themselves should they so choose.

The second alternative is to use the services of a petition preparer. This adds, in this Court's opinion, very little to the first option. Petition preparers are prohibited from providing legal advice in any fashion. Petition preparers are, in essence, typing services.[37] Many if not most debtors with the desire to represent themselves can do so without a petition preparer. The proper forms can be obtained from myriad sources at nominal cost, and are available from the Court on its Internet web site without charge. Certain versions of the forms are interactive, and can be completed from the user's personal computer. A legitimate question can be raised as to why an individual who believes himself capable of representing himself in bankruptcy court would at the same time feel the need to hire a typist to complete forms which the debtor must alone fill out.[38]

The third alternative, one used by fully 90% of the debtors filing in this District,[39]

36. *See, Dunnagan,* at p. 13, n. 6.

37. *See Farness,* 244 B.R. 464, 470, 00.1 I.B.C.R. 26, 27 (Bankr.D.Idaho 2000); *In re Mitchell,* 97.1 I.B.C.R. 5, 6 (Bankr.D.Idaho 1997). *See also, In re Landry,* 268 B.R. 301, 2001 WL 1203289 (Bankr.M.D.Fla.2001); *In re Gomez,* 259 B.R. 379, 385 (Bankr.D.Colo. 2001); *In re Guttierez,* 248 B.R. 287, 296 (Bankr.W.D.Texas 2000); *Hastings v. United States Trustee (In re Agyekum),* 225 B.R. 695, 702 (9th Cir. BAP 1998). *Accord, Iowa Supreme Court Commission on Unauthorized Practice of Law v. Sturgeon,* 635 N.W.2d 679 (Iowa 2001).

38. Petition preparers may not solicit information needed to complete the forms, advise debtors as to available exemptions, tell debtors how to fill out the petition, schedules or statements, answer debtors' questions, or manipulate the debtor's draft in finalizing it for filing. *See* cases cited at n. 37, *supra.* As stated in *Guttierez,* "So what does § 110 tacitly permit? The answer in a nutshell is 'not much.'" 248 B.R. at 297.

39. Statistics maintained by the Clerk of the Court reflect that, as of October 2001, some 620 *pro se* cases were pending, representing about 9% of the total. The percentage, tracked monthly, has not varied more than a

is the retention of a licensed lawyer to assist them in successfully navigating the statutory channels of bankruptcy law. Rates in this District for this sort of engagement, in basic consumer chapter 7 cases, range from a few hundred dollars to something less than $1,000.[40] Several factors may impact the question of the fee charged, for example, the skill or experience of the attorney, competition, or the nature of the local market within this District where the attorney practices.

In the case of Counsel, $250.00 is not a bargain simply because others charge more. Counsel's rate is not comparable to the rates quoted to debtors by other lawyers because Counsel will not provide the same scope of services. Here Counsel's reduced rate reflects that the representation purchased is far more limited.

The question, then, is whether a lawyer's bankruptcy services to a debtor can be limited and, if so, under what circumstances.

### b. Limits on limiting

When a consumer debtor files for chapter 7 relief, he [41] faces a large number of burdens. He needs to ensure that his debts and assets, and income and expenses, are all completely and accurately scheduled. He needs to consider which of his assets may be exempt under applicable law, and assert such claims. He must disclose prior financial transactions as required by law, and ensure that correct and complete answers are given to numerous questions on the statement of financial affairs. He has to identify how he intends to deal with his collateralized obligations, including whether he plans to reaffirm, redeem, surrender, or retain and continue paying for those goods, and he must perform that intention.

He must meet and cooperate with his trustee, and must ensure that property of the estate and documents and records are provided to the trustee. If the trustee has concerns over his claimed exemptions, he'll have to defend these exemptions, which might require litigation if some other resolution isn't reached.

The debtor must testify, under oath, at a meeting of creditors, and answer the questions of the trustee and any creditors who chose to appear. What he says there may have significant repercussions, as might the testimonial assertions in his schedules.

If things proceed smoothly, the debtor will receive a discharge. But he will likely need advice as to its extent and limits. He may encounter creditors who ignore his discharge and try to collect a debt scheduled in the case. Prior to discharge, he may also hear from creditors who ignore his filing and try to continue collection activities. Or he may face discrimination at work or otherwise due to his bankruptcy. While all these types of conduct can be halted, the debtor needs someone to tell him so, and to assist him in enforcing his rights.

There may be objections to creditor claims raised by the Trustee. The debtor will wonder how this affects him, and whether he should care. There may be issues with family members or others who are "co-debtors." He may be approached

---

point over the past several years. These bankruptcy filing statistics, as well as others, are reported monthly and available on the Court's Internet web site.

**40.** Actually, the bottom of the scale is $0, as many Idaho attorneys often, and appropriately, provide their services without charge. Of course, in the extraordinary chapter 7 case, with complicated factual or legal issues, the initial fee might be substantially higher than $1,000. Neither end of the continuum is at issue today.

**41.** The masculine form is used solely for convenience.

by a utility with a request for security deposit for continued service, and need to decide whether he should consent or resist. He may receive pleadings in the mail, full of legal terminology and requesting "termination" or "annulment" of the stay, or "abandonment" or an order requiring him to decide whether to "assume or reject" an unexpired lease or an "executory contract." He may have rent-to-own contracts, or payday loans or title loans, which must be addressed.

·He almost certainly will receive solicitations to reaffirm debts. He'll need to turn to someone (other than the creditor) for advice on what reaffirmation means, whether he must or should reaffirm, and whether other options are available. He may have judgment liens, or nonpossessory, non-purchase money security interests on exempt chattels, which can be avoided in order to ensure his fresh start.

In facing these many burdens and difficulties, the *pro se* debtor goes it alone. But the represented debtor can turn to his attorney for advice and assistance. May the attorney refuse to provide that help? Are some of these areas so relatively unimportant that they can be excluded from the scope of the attorney's engagement? Which ones? In all cases?

Though not a great deal has been written on these questions, perhaps because the answer is rather obvious or because most lawyers don't view their professional responsibilities in such a blinkered way, there is some guidance.[42]

A primary example is *In re Bancroft,* 204 B.R. 548 (Bankr.C.D.Ill.1997), which considered an attorney's conduct in five cases. In each, the attorney charged $150.00 to represent chapter 7 debtors. He would not agree to represent them at the creditors' meeting without payment of an additional fee. As does Counsel here, the attorney in *Bancroft* took the "position that he provides an alternative to the usual form of [debtor] representation." 204 B.R. at 549.

The court rejected the alternative. In so doing, it provided an excellent analysis of the duality inherent in practicing law— that it is both a profession and a business. These comments have general applicability to situations in addition to those presented by Counsel's extreme approach.[43] They are therefore set out at length.

The answer to the . . . question of whether there is a minimum level of representation in bankruptcy to claim a professional fee is clearly yes. That conclusion is drawn from the Bankruptcy Code, which, by Sections 327 to 330, draws a distinction between professional fees and § 110 which governs a "bankruptcy petition preparer."

The more difficult questions are what are the minimum services required to claim a fee, may they be waived, and if so, on what basis. These questions have to be answered at a time when the approaches to the practice of law have changed and continue to change. In an economic context the practice of law for a livelihood is a profit oriented business. With the changing approaches to the

---

**42.** In addition to the bankruptcy court decisions discussed *infra,* the Court notes the decision of the Ohio Supreme Court in *Columbus Bar Association v. Flanagan,* 77 Ohio St.3d 381, 674 N.E.2d 681, 683 (1997).

**43.** Though Counsel and Mr. Palmer are the only attorneys in this District which have embraced limitation of services to the extent of

nonappearance, a few others have attempted to limit their engagement and carve out specific functions or responsibilities. It is a credit to Idaho's debtor bar that the vast majority of attorneys do not seek to eliminate, or charge extra for performing, their responsibilities.

practice of law the business aspects associated with the profession have come to the forefront and have taken on a new importance.

This is especially apparent where legal services are being provided to the occasional consumer of such services, someone who does not regularly use an attorney. For example, someone seeking to dissolve a marriage, to pursue a personal injury, or to file a bankruptcy case. There is overt competition to represent the occasional consumer of legal services. Attorneys advertise. Consumers respond. Some consumers shop for legal services, primarily considering the fee at which the legal services are offered. Some are willing to limit the services they receive for a limited fee.

The legal profession is paying more attention to the bottom line. Part is due to competition, part to consumer demand for efficiency and affordable fees, and part to a recognition that an attorney's time is limited and if the bottom line is to be improved, ways have to be found to provide more services in a limited amount of time.

These factors have led to an increased use of support staff, trained and experienced paralegals and secretaries, to handle routine matters not involving legal judgments or advice, and an increased use of computers to generate routine forms and documents. Some in the profession are willing to practice law by specializing, limit the services they offer, charge a lower fee, and rely on their support staff and volume to maintain or improve the bottom line. Those approaches to the practice of law can result in there being a dim line between

what is, or is not, required to justify a professional fee.

204 B.R. at 550–51 (a footnote, recognizing similar changes have occurred in approaches to creditor representation, is omitted).

The court then focused on the fact that the lawyer was engaged in a "profession" and not just a business. By virtue of that fact, the Illinois Rules of Professional Conduct applied to his chosen means of making a daily living. They included Rule 1.1(a):

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation necessary for the representation.

Rule 1.2(c) stated:

A lawyer may limit the objectives of the representation if the client consents after disclosure.

And Rule 1.4(b) provided:

A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

*Id.* at 551. Idaho Rules of Professional Conduct 1.1, 1.2(c), and 1.4 are virtually identical.[44]

*Bancroft* continued:

It would follow that a professional, practicing bankruptcy law, cannot apply a high level of knowledge and skills unless he has some contact, and first meets, with the client to determine the clients needs and explains what action, if any, is required and its effects. Reviewing papers prepared by a secretary from information supplied by a client to a secretary is not sufficient, as the high

---

**44.** I.R.P.C. 1.2(c) states "A lawyer may limit the objectives of the representation if the client consents after *consultation.*" (Emphasis supplied). As can be seen from the quote in the text, *infra, Bancroft* analyzes "disclosure" in a thoughtful, comprehensive fashion. Idaho's use of the term "consultation" certainly implies no less.

level of knowledge and skills is not present when the questions are asked. The secretary may or may not ask the right questions. Furthermore, if a problem exists, the secretary may not recognize it as such. If the secretary did so, the secretary cannot advise the client, as that would constitute the practice of law.

Nor can the attorney apply his professional knowledge and skills without attending the first meeting of creditors. By filing the petition in bankruptcy, the attorney sets in motion a series of events, including the first meeting of creditors, which exposes a layperson to a potential plethora of legal hurdles. The layperson will be exposed to questioning by a professional trustee and attorneys representing creditors. The layperson may be asked to take certain actions. In response, the layperson, acting out of ignorance or feeling that there was no need for an attorney to represent him, may say something to his or her detriment. Having initiated the process, an attorney must shepherd the client through it, to its conclusion.

The last two questions that need to be answered is whether legal services can be waived by a client, and if so, on what basis. Under Rule 1.2(c) of the RPC, an attorney can limit the scope of representation, but only if the client consents after disclosure. Disclosure involves the attorney explaining to a debtor the nature of the bankruptcy process, what problems could or will be encountered, how those problems should be addressed, and the risks or hazards, if any, associated with those problems. Consent involves a clear understanding on the part of the debtor as to these factors and the possible results of a debtor proceeding without an attorney being present.

. . .

It is less than sincere to suggest that the attorney is offering a reasonably priced alternative to usual legal representation, when there is no showing the alternatives were explained by the attorney to the debtors and the debtors made a knowledgeable decision. It would appear to this Court that the debtors in effect received nothing more than the services of a "bankruptcy petition preparer" when they met with the attorney's secretary who took the information and prepared the petition and schedules. *Id.* at 551–52.[45]

In *In re Pair*, 77 B.R. 976 (Bankr. N.D.Ga.1987), the court considered an attorney's habit of separately charging for services after filing, and collecting those fees without disclosure or court approval. 77 B.R. at 977–80. This was clearly improper. *Id.; see also, In re Soderberg*, 99.4 I.B.C.R. 152, 153 (Bankr.D.Idaho 1999). In addressing this attorney's conduct, the court also stated:

Once employed, counsel's representation continues unless and until he is discharged by the debtor or withdraws upon court approval. Such court approval involves considerations of fairness, reasonableness and proper protection of debtor's rights based on circumstances in each case. While they should not be unreasonably burdened, counsel cannot be permitted to initiate cases and then simply abandon debtors. Absent exceptional circumstances, counsel will be required to represent the debtor client until the conclusion of the case.

77 B.R. at 979.

The court in *Merriam*, discussed earlier in regard to the attorney's "ghostwriting"

**45.** The court reaffirmed the *Bancroft* analysis and holding in a subsequent decision involving the same attorney. *In re Stegemann*, 206 B.R. 176 (Bankr.C.D.Ill.1997).

and failure to sign the petition, also considered limitation of services as well. 250 B.R. at 728–30, 736–39. The particular service excluded there was attendance at the meeting of creditors. While the court ultimately refused to reduce counsel's fees, two factors are worthy of note. First, the rules of professional conduct in Colorado specifically allowed for the "unbundling" of legal services. *Id.* at 735–36 (noting modified provisions of Colo. Rule of Professional Conduct 1.2(c), and noting that District's Amended Administrative Order 1999–6. That amended order, though generally disapproving of the modified state practice, allows some limitation in bankruptcy representation with disclosure). Neither Idaho's rules of professional conduct nor this Court's local rules or general orders have any equivalent grant.

Second, *Merriam* recognized that not every case is identical, and attendance at the creditors' meeting would be "critical" in some cases, "of benefit" in others, and "relatively unimportant" in others. *Id.* at 739. This implies that an approach which eschewed, across the board, any duty to appear could not be countenanced. The limitation would have to be justified in a given case.

This Court concludes *Bancroft, Pair* and like approaches strike the appropriate balance, and that *Merriam* does not require validation of Counsel's sweeping limitation of legal duties. The Colorado rules and administrative structure are different. And *Merriam* also recognizes that each case is unique, and each debtor must be shown to have made an informed decision. Thus even though *Merriam* supports elimination of a need to attend a creditors' meeting in a given case where both informed consent was given and the utility of the meeting was slight, this does not support the approach that Counsel proposes here.

■ The inquiry here, must be made in light of Idaho's Rules of Professional Conduct, and in light of this Court's inherent ability to address matters regarding appearances and practice before it.[46] Counsel's suggested exclusion of all post-bankruptcy responsibilities could only be proper if predicated on a debtor's informed consent after consultation. The quality of such informed consent is critical. Unless debtors truly understand what they bargain away, the bargain is a sham.

■ In order to make an informed decision, the client must understand what might be faced in the bankruptcy, and the risks associated with representing himself in handling those contingencies. Many lawyers find themselves surprised by what can arise in an otherwise "simple" bankruptcy case. The reported decisions of this and other bankruptcy courts make it clear that, even in garden variety consumer chapter 7 cases, counsel for debtors and those who might be characterized as their adversaries (creditors, or occasionally the trustee) sometimes have distinctly polar views of what is permissible and what is not. The ability to adequately explain the lay of the bankruptcy landscape, including all its variations, contingencies and permutations, in order to obtain a truly informed consent is suspect.

To send a debtor into a bankruptcy *pro se,* on the theory that he has had "enough" advice and counseling in the document preparation stage to safely represent himself, is except in the extraordinary case so fundamentally unfair as to amount to misrepresentation. Even Counsel appears to know, at some level, that this is so. Virtually all his Itemizations show post-petition conferences with debtors and, in a few,

---

46. *See Crayton,* 192 B.R. at 975–76.

with creditors. In most of these cases, Counsel filed corrected or amended pleadings. He sent interns to "attend" eight first meetings and he purportedly attended the other 11 first meetings personally to "observe." If debtors were adequately advised, and if it was safe to allow debtors to represent themselves under the suggested approach, why was there a need for any of these services?

To be sure, some of the attorney's obligations can be at least partially fulfilled in the pre-petition stage of representation. But it requires a leap to believe that, after the filing occurs, no problems will arise and no further help be required. It is a leap that one familiar with the gamut of chapter 7 cases would not easily make.

■ An attorney, in accepting an engagement to represent a debtor in a bankruptcy case, will find it exceedingly difficult to show that he properly contracts away any of the fundamental and core obligations such an engagement necessarily imposes. Proving competent, intelligent, informed and knowing consent of the debtor to waive or limit such services inherent to the engagement will be required. Compliance with I.R.P.C. 1.1, 1.2 and 1.4 is mandatory, and must be proved.

■ What are these core obligations? The first, and most obvious, is the obligation to appear as debtor's counsel of record and to represent the debtor. The attempt of Counsel to validate a standard or routine process of sending clients into bankruptcy court "unrepresented" as *pro se* debtors is unacceptable and rejected.

■ Furthermore, for clarity, when accepting an engagement to represent a debtor in relation to a bankruptcy proceeding, an attorney must be prepared to assist that debtor through the normal, ordinary and fundamental aspects of the process. These include the proper filing of all required schedules, statements and disclo-

sures; preparation and filing of necessary amendments to the same; attendance at the § 341 meeting; turnover of assets to the trustee, and cooperation with the trustee; compliance with the tax turnover and other orders of the Court; performance of the duties imposed by § 521(1), (3) and (4); counseling in regard to § 521(2) and the reaffirmation, redemption, surrender or retention of consumer goods securing obligations to creditors, and assisting the debtor in accomplishing those aims; and responding to issues that arise in the basic milieu of the bankruptcy case, such as violations of stay and stay relief requests, objections to exemptions and avoidance of liens impairing exemptions, and the like.

■ It is difficult to describe every such service, much less predict each variation from the norm, which might arise in a given case. Indeed, this is a large part of the reason why truly informed consent limiting future services would be so difficult to establish. The summary above is, therefore, not intended to be and cannot be read to be exclusive. Rather, it is illustrative of key issues which arise with sufficient regularity and which are common to all consumer bankruptcies so as to be part and parcel of the engagement. What else might be found to fall within or without must await specific facts and specific cases. But the closer to the heart of the matter—the debtors' desire to obtain bankruptcy relief and the process necessary to do so—the less likely exclusion is appropriate.

c. **Providing and charging for services**

The Court shares the concerns voiced in *Bancroft*. There must be a sensitivity to the need of debtors' attorneys to find time-effective and cost-effective ways to deliver professional services, and a sensitivity to the changing marketplace. But at the same time, attorneys are professionals. Individuals place their financial lives, and

more, in their attorney's hands. Attorneys have ethical obligations to their clients regardless of the economic pressures which might exist. The balance cannot be tipped toward the interest in collecting fees to the detriment of the client's right to thorough and competent representation. If the proper balance cannot be maintained, the engagement should not be accepted. As stated in *Pair:*

> [A]n attorney has certain obligations and duties to a client once representation is undertaken. These obligations do not evaporate because the case becomes more complicated or the work more arduous or the retainer not as profitable as first contemplated or imagined. Attorneys must never lose sight of the fact that the profession is a branch of the administration of justice and not a mere money-making trade.

77 B.R. at 978, quoting *Kriegsman v. Kriegsman,* 150 N.J.Super. 474, 375 A.2d 1253, 1256 (1977).

How much to charge for this sort of legal work is a matter initially left to the attorney who chooses to practice in the field, and then to the client who may accept, reject, or attempt to negotiate the quoted fee. Subsequently, of course, the final charge is open to judicial review.[47]

Counsel appears to argue that "fully" performing the duties of a debtor's attorney would require a higher fee, and disenfranchise those on the lowest economic rungs whom he serves with his $250.00 flat fee.[48] The Court has been and is sympathetic to the circumstances of these least fortunate debtors. But the Court is also concerned that they not be short-changed due to their status, and denied the advice and assistance to which they are entitled when an attorney agrees to represent them, whatever the fee may be.

■ If either lawyer or client wishes to limit services in order to preserve a lower fee, that limitation must be carefully considered and narrowly crafted, and be the result of educated and informed consent.

A final observation: The bankruptcy bar in this District can be justifiably proud that only in a few, rare cases has the Court been given any cause for concern that legal services may not have been fully, properly, and professionally delivered. The Court appreciates that its decisions in such cases such as this, involving professional fees or services, resonate widely among the bar. However, it should be recognized that such decisions are required in but a small handful of cases out of the several thousand filed, and ably prosecuted, each year.

## IV. CONCLUSION

■ The Court finds and concludes that Counsel has failed to provide the record or justification necessary to meet his burden of showing the reasonableness of any of the fees charged and costs claimed.

---

47. As *Pair* states: "Attorneys' fees in bankruptcy case are not matters for purely private agreement.... Pursuant to Bankruptcy Rule 2017, the court on its own motion or the request of a party in interest, may order a refund of the payments determined to be excessive to the estate or the debtor. The court may do this despite agreements between the debtor and his attorney." 77 B.R. at 979.

48. But recall that Counsel states, with some vehemence, that he has not allowed and will not allow his clients to be jeopardized by factors arising in their cases after he has sent them in *pro se*. If his Itemizations are to be believed, he has been willing to provide "quantum meruit" services worth $939.30 (Case No. 01–40696) to $1,508.60 (Case No. 01–40625) without any increase of the $250 flat fee charged his clients. Counsel can continue to charge $250.00 if he likes. Counsel can charge something higher. Whatever he charges, his core duties will remain constant, as will his burden to establish reasonableness of his services and fees.

The first failure flows from inadequate description and explanation of services. However, Counsel also errs in attempting to justify the fee by claiming value was given for clearly noncompensable services and by overstating, or overcharging for, other services.

The defects in the submissions impugn the credibility of the applicant, which credibility must be assumed in order to conclude that other theoretically proper pre-petition legal services were personally performed by him and support the flat fee charged.

And, finally, it is Counsel's refusal to recognize and honor the obligations of an attorney accepting an engagement, and instead attempting to parse those duties, that mandates the conclusion that reasonableness was not shown.

These defects and Counsel's failure of proof and persuasion as to the reasonableness of his fee would support disallowance of any compensation at all. They would also support, therefore, the lesser consequence of a reduction in compensation.[49] Chief Judge Pappas in *Henderson* allowed Mr. Palmer compensation in only a limited amount, reducing the flat fee of $245 charged by Mr. Palmer to $125.00. *Id.*, at p. 9.[50]

While under the above findings and conclusions complete disgorgement would be warranted, the Court will instead reduce Counsel's compensation to $125.00 per case, as was the result in *Henderson* and its three companion cases. This reflects

consistency of approach to the only two attorneys in Idaho who, thus far, have advanced the idea of limited representation to such an extended degree.

With the fees thus reduced, Counsel will be ordered to disgorge $125.00 in each of the 19 cases. Such sums shall be reimbursed to the respective debtors. Proof of compliance will be required, and the Court will retain jurisdiction. An order consistent herewith will be entered in each case.

---

**49.** *See, e.g., Jastrem,* 253 F.3d at 443 (such failure supports order under § 329(b) and Rule 2017(a) requiring return of the fee that exceeds the reasonable value of services).

**50.** The Court stated:

The Court declines to recognize any special value in connection with Mr. Palmer's efforts in these cases. Rather than providing a service, Palmer could have actually prejudiced his clients interests by leading

them to believe an attorney had thoughtfully reviewed their cases and assisted them in securing appropriate relief, when obviously no such legal analysis or exercise of professional judgment occurred. Under these circumstances, the Court refuses to allow compensation to a lawyer at a rate in excess of that normally charged by nonprofessional petition preparers.

*Id.* at p. 8.